**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES R. SMITH,
        *Plaintiff-Appellant,*

v.

SALISH KOOTENAI COLLEGE;
COURT OF APPEALS OF THE
CONFEDERATED SALISH AND
KOOTENAI TRIBES OF THE FLATHEAD
RESERVATION,
        *Defendants-Appellees.*

No. 03-35306

D.C. No.
CV-02-00055-LBE

OPINION

Appeal from the United States District Court
for the District of Montana
Leif B. Erickson, Magistrate Judge, Presiding

Argued and Submitted En Banc
June 23, 2005—San Francisco, California

Filed January 10, 2006

Before: Mary M. Schroeder, Chief Judge,
Pamela Ann Rymer, Michael Daly Hawkins,
Barry G. Silverman, Susan P. Graber, Ronald M. Gould,
Richard A. Paez, Marsha S. Berzon, Richard R. Clifton,
Jay S. Bybee, and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Gould

103

## COUNSEL

Rex Palmer, Attorneys Inc., P.C., Missoula, Montana, for the plaintiff-appellant.

Robert J. Phillips, Phillips & Bohyer, P.C., Missoula, Montana, for defendant-appellee Salish Kootenai College; John T. Harrison, Legal Department, Confederated Salish and Kootenai Tribes of the Flathead Indian Reservation, Pablo, Montana, for defendant-appellee Court of Appeals of the Confederated Salish and Kootenai Tribes of the Flathead Reservation.

Mary L. Smith, Washington, D.C., for amicus curiae National Congress of American Indians.

## OPINION

BYBEE, Circuit Judge:

The question presented in this case is whether a non-Indian plaintiff consents to the civil jurisdiction of a tribal court by

filing claims against an Indian defendant arising out of activities within the reservation where the defendant is located. Appellant James Smith, who is not a member of the Confederated Salish and Kootenai Tribes ("the Tribes") of the Flathead Reservation, filed a claim in tribal court against Salish and Kootenai College ("SKC") arising out of an automobile accident. After a jury returned a verdict in favor of SKC, Smith sought an injunction in federal court, alleging that the tribal court lacked subject matter jurisdiction. The tribal courts had previously held that they had jurisdiction to adjudicate the case, and the district court agreed and denied the injunction. Concluding that Smith's suit is within the first exception of *Montana v. United States*, 450 U.S. 544 (1981), and the rule in *Williams v. Lee*, 358 U.S. 217 (1959), we affirm.

## I.   FACTS AND PROCEDURAL HISTORY

Salish and Kootenai College was established by the Confederated Salish and Kootenai Tribes of the Flathead Reservation in Montana. Its mission is "to provide quality postsecondary educational opportunities for Native Americans" and "to promote and help maintain the cultures of the Confederated Tribes of the Flathead Indian Nation." Mission Statement, http://www.skc.edu/ (last visited Oct. 17, 2005). SKC is located on tribal land in Pablo, Montana, where it reports 56 full-time instructors, 28 part-time instructors, and more than 1100 students. More than three-quarters of SKC's students are affiliated with an Indian tribe; more than one-third of these are affiliated with the Confederated Salish and Kootenai. The Tribes incorporated SKC under tribal law in 1977, and a year later SKC was incorporated under state law. Under its articles of incorporation, SKC may sue and be sued in its corporate name in the tribal courts. Its bylaws stipulate that each of the seven members of the Board of Directors must be an enrolled member of the Confederated Salish and Kootenai Tribes. The Tribal Council appoints the members of

the Board and may remove them. SKC admits nonmembers of the Tribes.

Smith was enrolled as a student at SKC, although he is a member of the Umatilla Tribe and not of the Confederated Salish and Kootenai Tribes. As part of a course in which he was enrolled, Smith was driving a dump truck, owned by SKC, on U.S. Highway 93 within the Flathead Reservation. Two fellow students were passengers in the truck. Allegedly, the right rear main leaf spring broke, causing the truck to veer sharply and roll over. One passenger, Shad Eugene Burland, was killed, and Smith and a second passenger, James Finley, were seriously injured. Both Burland and Finley were enrolled members of the Confederated Salish and Kootenai Tribes.

The procedural history that culminates in this appeal is complex. Burland's estate filed a wrongful death action in tribal court against SKC and Smith. SKC filed a cross-claim against Smith. Finley then filed suit against SKC and Smith, and Smith filed his own cross-claim against SKC. The tribal court consolidated the cases, and all claims were settled except Smith's cross-claim against SKC. Rather than with-drawing his cross-claim and filing in another court, Smith elected to litigate the claim fully in tribal court. The tribal court realigned the parties, naming Smith as the plaintiff and SKC as the defendant. The claims went to a jury, which returned a verdict in favor of SKC.

Following the unfavorable verdict, Smith argued for the first time that the tribal court did not have subject matter juris-diction. He first sought post-judgment relief in tribal court. At the same time, he filed an appeal of the judgment with the tribal appeals court, which remanded to the tribal trial court to determine jurisdiction. The tribal court determined that it had jurisdiction, and Smith again filed an appeal with the tribal appeals court. While his second tribal-court appeal was pending, Smith filed a motion for an injunction in federal dis-

trict court on the ground of lack of jurisdiction, and sought to file his cross-claim as an original complaint in that court.

Before the federal district court ruled on the injunction, the tribal appellate court issued an opinion affirming the tribal court's jurisdictional ruling. The federal district court then issued its order finding that the tribal court had jurisdiction and denying the injunction. Smith appealed the judgment of the district court. A panel of our court reversed on the ground that the tribal court lacked jurisdiction over Smith's claims. *Smith v. Salish Kootenai Coll.*, 378 F.3d 1048 (9th Cir. 2004). We vacated that opinion and granted en banc review. 407 F.3d 1267 (9th Cir. 2005).

## II.   STANDARD OF REVIEW

The question of tribal court jurisdiction is a federal question of law, which we review *de novo*. *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 852-53 (1985); *FMC v. Shoshone-Bannock Tribes*, 905 F.2d 1311, 1314 (9th Cir. 1990). We review findings of fact for clear error. *Id.* at 1313.

## III.   ANALYSIS

### A

Sixteen years ago, we observed that "[t]here is no simple test for determining whether tribal court jurisdiction exists." *Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1228 (9th Cir. 1989). The statement is no less true today. We recently noted that questions of jurisdiction over Indians and Indian country remain a " 'complex patchwork of federal, state, and tribal law,' which is better explained by history than by logic." *United States v. Bruce*, 394 F.3d 1215, 1218 (9th Cir. 2005) (quoting *Duro v. Reina*, 495 U.S. 676, 680 n.1 (1990)).

Our analysis of the tribal court's jurisdiction starts with the Supreme Court's decision in *Montana*, a "pathmarking case concerning tribal civil authority over nonmembers." *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997); *see County of Lewis v. Allen*, 163 F.3d 509, 513 (9th Cir. 1998) (en banc). In *Montana*, the Court found that tribal courts have two bases for their authority. First, tribes possess inherent power "necessary to protect tribal self-government [and] to control internal relations." *Montana*, 450 U.S. at 564. This includes the inherent power "to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members." *Id.* Second, tribes possess such additional authority as Congress may expressly delegate. *Strate*, 520 U.S. at 445; *Montana*, 450 U.S. at 564. As no party contends that Congress has expressly granted the Confederated Salish and Kootenai Tribes the authority to hear this suit, we will consider only whether the Tribes have such inherent authority. *See United States v. Lara*, 541 U.S. 193, 210 (2004).

"Indian tribes have long been recognized as sovereign entities, 'possessing attributes of sovereignty over both their members and their territory.' " *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 591 (9th Cir. 1983) (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978) (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975))). The basis for tribal jurisdiction is the tribes' inherent need to define the terms for enrollment, to determine the continuing status of their members, and to regulate relations among their members. *Strate*, 520 U.S. at 459; *Montana*, 450 U.S. at 563-64. Owing to their historical status as "dependent sovereign[s]" within the United States, the tribes hold territory reserved by the United States for the tribes as their principal physical asset. *Lara*, 541 U.S. at 229 (Souter, J., dissenting). The tribes retain legislative and adjudicative jurisdiction to provide for disposition of reserved lands and to regulate activities on those lands.

**[1]** In general, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana*, 450 U.S. at 565. This principle is "subject to two exceptions: The first exception relates to nonmembers who enter consensual relationships with the tribe or its members; the second concerns activity that directly affects the tribe's political integrity, economic security, health, or welfare." *Strate*, 520 U.S. at 446. The Court first identified these two exceptions in *Montana*. There, it explained that

> Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. [1] A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. [2] A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Montana*, 450 U.S. at 565-66 (citations omitted).[1]

---

[1]Ordinarily, so long as there is a "colorable question" whether a tribal court has subject matter jurisdiction, federal courts will stay or dismiss an action in federal court "to permit a tribal court to determine in the first instance whether it has the power to exercise subject-matter jurisdiction in a *civil* dispute between Indians and non-Indians that arises on an Indian reservation." *Stock W. Corp. v. Taylor*, 964 F.2d 912, 919 (9th Cir. 1992) (en banc); *see Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9 (1987); *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 857 (1985) ("Exhaustion of tribal court remedies . . . will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise . . . ."). The district court did not issue its decision until Smith had exhausted his appeals in the Confederated Salish and Kootenai tribal courts.

The Court's recent cases, and our own experience with the *Montana* exceptions, demonstrate that there are two facts courts look to when considering a tribal court's civil jurisdiction over a case in which a nonmember is a party. First, and most important, is the party status of the nonmember; that is, whether the nonmember party is a plaintiff or a defendant. As Justice Souter observed in *Nevada v. Hicks*, "[i]t is the membership status of the unconsenting party, not the status of real property, that counts as the primary jurisdictional fact." 533 U.S. 353, 382 (2001) (Souter, J., concurring). The Court has repeatedly demonstrated its concern that tribal courts not require "defendants who are not tribal members" to "defend [themselves against ordinary claims] in an unfamiliar court." *Strate*, 520 U.S. at 442, 459. Second, the Court has placed some store in whether or not the events giving rise to the cause of action occurred within the reservation. *See Hicks*, 533 U.S. at 360 ("The ownership status of land . . . is only one factor to consider . . . ."). Within the reservation, "[t]o be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians . . . even on non-Indian fee lands," *Montana*, 450 U.S. at 565, but subject to an exception not relevant here, "there can be no assertion of civil authority beyond tribal lands." *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 658 n.12 (2001).

**[2]** The interaction of these factors—the status of the parties and the connection between the cause of action and Indian lands—is complex. Nevertheless, the cases provide some guidance for our discussion, and we can summarize them as follows. First, where the nonmembers are the *plaintiffs*, and the claims arise out of commercial activities within the reservation, the tribal courts may exercise civil jurisdiction. *See Williams v. Lee*, 358 U.S. 217 (1959). Second, where the nonmembers are *defendants*, the Court has thus far held that the tribes lack jurisdiction, irrespective of whether the claims arose on Indian lands. *See Hicks*, 533 U.S. at 356 (claims arose on Indian fee lands); *Montana*, 450 U.S. at 547 (claims arose on non-Indian lands within the reservation). Our own

cases, however, suggest that whether tribal courts may exercise jurisdiction over a nonmember defendant may turn on how the claims are related to tribal lands.[2] Finally, where *neither* party is a tribal member the tribe lacks jurisdiction to adjudicate claims arising from an accident on a public highway within the reservation. *Strate*, 520 U.S. at 456-59.

The Court has drawn an important observation from this history. It has "never held that a tribal court had jurisdiction over a nonmember defendant." *Hicks*, 533 U.S. at 358 n.2. Nevertheless, it has "le[ft] open the question of tribal-court jurisdiction over nonmember defendants in general." *Id.*[3]

---

[2]*Compare Boxx v. Long Warrior*, 265 F.3d 771 (9th Cir. 2001) (cause of action arose on non-Indian fee land within the reservation; no jurisdiction in tribal courts); *Burlington N. RR. v. Red Wolf*, 196 F.3d 1059 (9th Cir. 1999) (cause of action arose on railroad right-of-way within the reservation; no jurisdiction in tribal courts); *State of Mont. Dep't of Transp. v. King*, 191 F.3d 1108 (9th Cir. 1999) (cause of action arose on state highway within reservation; no need to exhaust claims in tribal courts); *Wilson v. Marchington*, 127 F.3d 805 (9th Cir. 1997) (cause of action arose on U.S. highway within reservation; judgment of tribal court not entitled to recognition in U.S. courts); *and Yellowstone County v. Pease*, 96 F.3d 1169 (9th Cir. 1996) (county taxed member-owned land within reservation; no jurisdiction in tribal courts to enjoin the county), *with McDonald v. Means*, 309 F.3d 530 (9th Cir. 2002) (cause of action arose out of accident on tribal road; tribal court had jurisdiction); *Allstate Indem. Co. v. Stump*, 191 F.3d 1071 (9th Cir. 1999) (cause of action arose out of accident on tribal roads; remanded for exhaustion of tribal determination of jurisdiction); *and Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221 (9th Cir. 1989) (contracts with tribe for activities on reservation; tribal court's determination of jurisdiction entitled to comity).

[3]In light of the Court's observations on the relevance of party status, we are puzzled by the dissent's insistence that the *Montana* "framework applies to legal actions involving 'nonmembers' without limitation," and that we have "err[ed]" in holding that jurisdiction may turn on "whether the nonmember party is a plaintiff or defendant." Dissent at 129-30. Party status is plainly relevant, as the Court has repeatedly made clear. *See Hicks*, 533 U.S. at 358 & n.2; *id.* at 382 (Souter, J., concurring); *see also Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 854-55 (1985).

We next consider the status of the parties to this litigation and whether the claims are related to tribal lands.

B

1

**[3]** Smith's status as a nonmember is clear. James Smith is a not a member of the Confederated Salish and Kootenai Tribes. He is a member of the Umatilla Tribe, but for purposes of determining the tribal civil jurisdiction of the Salish and Kootenai Tribal Courts, he is a nonmember. *See Hicks*, 533 U.S. at 377; *see also Duro v. Reina*, 495 U.S. 676, 695-96 (1990).

What is less clear is whether Smith is a plaintiff or a defendant. The original suits were filed against Smith and SKC by Burland's estate and Finley; in that action, Smith was named as a defendant. Smith did not challenge the tribe's jurisdiction; instead, he filed a cross-claim against SKC, which had filed its own cross-claim against Smith. Prior to trial, the parties resolved all the claims except for Smith's cross-claim against SKC. The tribal court realigned the parties, and Smith became the plaintiff.

**[4]** In the posture in which this case came to us, Smith is the plaintiff. It is irrelevant for our purposes that Smith was originally named as a defendant. Courts may realign parties, according to their ultimate interests, whether the realignment has the effect of conferring or denying subject matter jurisdiction on the court. *See Standard Oil Co. of Cal. v. Perkins*, 347 F.2d 379, 382 (9th Cir. 1965); *see also* FED. R. CIV. P. 19(a) ("If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff."); CHARLES ALAN WRIGHT & MARY KAY KANE, LAW OF FEDERAL COURTS 177-78 (6th ed. 2002).

2

We next turn to the status of the defendant, SKC. SKC is neither a Tribe nor a member of the Tribes. Although in the original suit, the Confederated Salish and Kootenai Tribes were sued as a defendant along with Smith and SKC, the Tribes were dismissed on the ground that they had not waived their immunity in tribal court. SKC did not contend then and does not contend here that it shares the Tribes' immunity. Nor does SKC contend that it is eligible for tribal membership, which under the Tribes' constitution is limited to natural persons.

Civil tribal jurisdiction is not limited to matters affecting the tribe *qua* tribe or its members *qua* members. "[T]ribal self-government" is at the heart of tribal jurisdiction. *Montana*, 450 U.S. at 564. Tribes may govern themselves through entities other than formal tribal leadership. Of course, not every enterprise that is owned or staffed by members of a tribe may be considered a tribal entity for purposes of tribal jurisdiction, *see Atkinson Trading*, 532 U.S. at 657, but we have previously recognized that there are entities that are sufficiently identified with the tribe that they may be considered to be "tribal."

Whether an entity is a tribal entity depends on the context in which the question is addressed. *See Dille v. Council of Energy Res. Tribes*, 801 F.2d 373, 376 (10th Cir. 1986) (stating that "the definition of an Indian tribe changes depending upon the purpose of the regulation or statutory provision under consideration"). It is nevertheless useful to look at analogous cases, outside the area of tribal civil jurisdiction, where courts have been called upon to identify tribal entities. In *Pink v. Modoc Indian Health Project, Inc.*, 157 F.3d 1185 (9th Cir. 1998), we considered whether the Modoc Indian Health Project was a "tribe" and therefore exempt from the definition of a covered "employer" in Title VII. *See* 42 U.S.C. § 2000e(b) (2003). We found that Modoc was a "nonprofit corporation

created and controlled by the Alturas and Cedarville Ran-
cherias, both federally recognized tribes." *Pink*, 157 F.3d at
1187. Modoc's board of directors were appointed by federally
recognized tribes and "served as an arm of the sovereign
tribes, acting as more than a mere business." *Id.* at 1188. We
concluded that Modoc was exempt. Our holding is consistent
with decisions in other circuits. *See*, *e.g.*, *Hagen v. Sisseton-
Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000)
(community college chartered, funded, and controlled by
Tribe is a tribal agency entitled to sovereign immunity); *Duke
v. Absentee Shawnee Tribe of Okla. Hous. Auth.*, 199 F.3d
1123, 1125, 1126 (10th Cir. 1999) (housing authority was "an
enterprise designed to further the economic interests of the
Absentee Shawnee tribe, and the tribe has exclusive control
over the appointment and removal of its decisionmakers";
holding that the housing authority was exempt under Title
VII); *Dillon v. Yankton Sioux Tribe Hous. Auth.*, 144 F.3d
581, 583 (8th Cir. 1998) (for Title VII purposes, " 'a housing
authority, established by a tribal council pursuant to its pow-
ers of self-government, is a tribal agency[,]' . . . . rather than
a separate corporate entity created by the tribe" (quoting
*Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.*, 797 F.2d
668, 670 (8th Cir. 1986))); *Dille*, 801 F.2d at 373 (holding
that a council composed of tribes to manage their energy
resources was a tribe for Title VII purposes).

By contrast, in *NLRB v. Chapa De Indian Health Program,
Inc.*, 316 F.3d 995 (9th Cir. 2003), we considered whether the
Chapa-De Indian Health Program was subject to subpoena by
the National Labor Relations Board. Chapa-De had been
authorized by the Rumsey Indian Rancheria, a federally rec-
ognized tribe, and was a "tribal organization" for purposes of
the Indian Self Determination Act, 25 U.S.C. § 450b(*l*). None
of its board of directors was a member of the Rumsey Tribe,
although there were tribal members on the advisory board.
Almost half of Chapa-De's patients and its employees were
not Native Americans, and it operated facilities on non-Indian
land. We concluded that, although Chapa-De served the

*health needs* of the tribe, its *labor relations* were not "an intramural activity related to self-governance." *Chapa De*, 316 F.3d at 1000. Where the standard was "whether the NLRB 'plainly lack[ed]' jurisdiction," we concluded that "[j]urisdiction [was] not plainly lacking." *Id.* at 997, 1001 (quoting *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1077 (9th Cir. 2001)).

SKC is located on tribal lands on the Flathead Reservation, is incorporated under tribal and state law, and is described in its articles of incorporation as "[a] tribal corporation." SKC may sue and be sued in its corporate name in tribal court. Under SKC's bylaws, the Tribal Council appoints the board of directors, who must be members of the Tribes, and may remove members of the board. Although SKC does not claim that it is immune from suit in tribal courts, the Tribes created it and continue to exercise some control over the institution. Most students receiving degrees are Native Americans, and thirty-four percent of students are from the Confederated Salish and Kootenai Tribes. The college favors Native Americans in hiring, and about forty percent of faculty members are Indians. Even though the Tribes do not fund the college, SKC has been identified as a "tribal governmental agency." *See Bartell v. Am. Home Assurance Co.*, 49 P.3d 623, 624 (Mont. 2002) (referring to finding in federal district court). On the basis of this record, the Tribal Court of Appeals concluded that "SKC is a tribal entity closely associated with and controlled by the Tribes. For purposes of determining jurisdiction, it must be treated as a tribal entity." Similarly, the district court found that "SKC is a tribal entity or an arm of the tribe for purposes of federal Indian law regarding tribal court jurisdiction."

**[5]** We do not disagree with these assessments. This case is much closer to *Modoc* and the Eighth Circuit's decision in *Hagen* than it is to *Chapa De*. Like the Modoc Indian Health Project, SKC is a nonprofit corporation created as a "tribal corporation." *See Pink*, 157 F.3d at 1188. As in *Hagen*, and

unlike *Chapa De*, SKC's directors are members of the Tribes, selected and subject to removal by the Tribal Council. *Chapa De*, 316 F.3d at 1000; *Hagen*, 205 F.3d at 1042. The college, though open to nonmembers such as Smith, is located on tribal lands within the reservation and serves the Confederated Salish and Kootenai Tribes, unlike the Chapa De health program, which served tribal members and nonmembers in four facilities, none of which was on the reservation. *Chapa De*, 316 F.3d at 997, 1000. We conclude that SKC is a tribal entity and, for purposes of civil tribal court jurisdiction, may be treated as though it were a tribal "member."

3

We next turn to whether the claims bear some connection to Indian lands. This fact is significant, though not dispositive. In *Hicks*, the Court emphasized that "*Montana* applies to both Indian and non-Indian land. The ownership status of the land, in other words, is only one factor to consider." *Hicks*, 533 U.S. at 360; s*ee also id.* at 381 (Souter, J., concurring) (stating that "a tribe's remaining inherent civil jurisdiction to adjudicate civil claims arising out of acts committed on a reservation depends in the first instance on the character of the individual over whom jurisdiction is claimed, not on the title to the soil on which he acted"). Our inquiry is not limited to deciding precisely when and where the claim arose, a concept more appropriate to determining when the statute of limitations runs or to choice-of-law analysis. Rather, our inquiry is whether the cause of action brought by these parties bears some direct connection to tribal lands. *See Allstate Indem. Co. v. Stump*, 191 F.3d 1071, 1073-74 (9th Cir. 1999); *Stock W. Corp. v. Taylor*, 964 F.2d 912, 919-20 (9th Cir. 1992) (en banc).

[6] Smith brought two claims against SKC. First, he alleged that SKC was both negligent and strictly liable for its failure to maintain the truck and its leaf spring. Second, he alleged spoliation of evidence. Smith suffered his injuries on U.S.

Highway 93, which, as a federal highway within the reservation, is neither tribal land nor controlled by members of the Tribes. *See Strate*, 520 U.S. at 454-55. Both of Smith's claims, however, implicated SKC's actions on the college campus, not on the highway. Unlike the accident in *Strate*, where the plaintiff alleged that the defendants' negligence on public roads caused her injuries, Smith alleged negligence occurring on the reservation, on lands and in the shop controlled by a tribal entity, SKC.

**[7]** His spoliation claim similarly implicated SKC's actions at the college. Smith alleged that SKC destroyed notes from the post-accident investigation and that this destruction interfered with his ability to pursue his claims. SKC admitted that at least one of its employees took notes of interviews with students concerning the accident and the notes were "no longer available." The record is not clear where the notes were created or destroyed, though the district court assumed the destruction occurred at SKC. Whether or not the notes were in fact lost or destroyed on tribal lands, SKC had control over the notes. For our purposes, Smith's claim arose out of activities conducted or controlled by a tribal entity on tribal lands.

## C

We finally consider whether the tribal courts had sufficient interest to justify the exercise of subject matter jurisdiction in this case. We recognize that Smith's suit does not fit obviously within the two exceptions set out in *Montana*. Smith is not engaged in any of the illustrative "consensual relationships" described in *Montana*: "commercial dealing, contracts, leases, or other arrangements." 450 U.S. at 565. Any contractual relationship Smith had with SKC as a result of his student status is too remote from his cause of action to serve as the basis for the Tribes' civil jurisdiction. *See Atkinson Trading*, 532 U.S. at 656; *Strate*, 520 U.S. at 457. Smith might fit within the second Montana exception, which allows for tribal jurisdiction where the conduct of a non-member "threatens or

has some direct effect on the . . . economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566. The Court in *Montana* cited *Williams*, the case most closely analogous to Smith's, as an example of both the first and second exceptions. *Id.* at 565-66. Denying jurisdiction to the tribal court would have a direct effect on the welfare and economic security of the tribe insofar as it would seriously limit the tribe's ability to regulate the conduct of its own members through tort law. *See infra* pp. 125-27. But, because we conclude that Smith's agreement to invoke the jurisdiction of the tribal court fits more comfortably within the first exception, we need not decide whether the second also applies.

Although we find that Smith's claims do not fit easily with the literal examples cited in the first *Montana* exception, we nevertheless believe that the Tribes' exercise of civil jurisdiction is consistent with the principles set forth in *Montana* and succeeding cases. This case, unlike the Court's decisions in *Hicks*, *Strate*, and *Montana*, involves a nonmember plaintiff. In this regard Smith is similarly situated to the principal case cited as an example of the *Montana* exceptions: *Williams v. Lee*. This is important, because as a plaintiff Smith chose to appear in tribal court. We are of the opinion that, even though his claims did not arise from contracts or leases with the Tribes, Smith could and did consent to the civil jurisdiction of the Tribes' courts. And in this case, the exercise of tribal jurisdiction is consistent with the limited sovereignty of the Tribes.

1

In *Williams*, Hugh Lee, a non-Indian, brought suit in Arizona state court against Paul Williams, who was a Navajo Indian. Williams purchased goods at Lee's store on the reservation and failed to pay for them. Williams argued that exclusive jurisdiction lay in the tribal courts because Arizona had not accepted concurrent jurisdiction under a congressional act. The Supreme Court agreed. Noting that the Navajo courts

"exercise broad criminal and civil jurisdiction which covers suits by outsiders against Indian defendants," the Court found that it was "immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there." 358 U.S. at 222, 223.

The Court's recent decisions in *Hicks* and *Strate* reaffirm the validity of *Williams*. Most recently, in *Hicks*, the Court cited *Williams* as an example of "private individuals who voluntarily submitted themselves to tribal regulatory jurisdiction by the arrangements that they . . . entered into." 533 U.S. at 372. Elsewhere the Court made clear that *Williams* was a case involving "claims brought against tribal defendants." *Id.* at 358 n.2; s*ee also Strate*, 520 U.S. at 457; *Three Affiliated Tribes v. Wold Eng'g*, 467 U.S. 138, 148 (1984). Similarly, in *Strate*, the Court was careful to frame the issue as concerning "the adjudicatory authority of tribal courts over personal injury actions *against defendants* who are not tribal members." 520 U.S. at 442 (emphasis added); s*ee also id.* (holding that "tribal courts may not entertain claims *against nonmembers* arising out of accidents on state highways" (emphasis added)).

**[8]** Smith is within the *Williams* rule. Smith comes to this proceeding as the plaintiff, in full control of the forum in which he prosecutes his claims against SKC. Although he did not have a prior contractual relationship with a tribal member, he brought suit against SKC, a tribal entity, for its allegedly tortious acts committed on tribal lands. We do not think that civil tribal jurisdiction can turn on finely-wrought distinctions between contract and tort. *See* W. PAGE KEETON, et al., PROSSER AND KEETON ON TORTS 4-5 (5th ed. 1984).**[4]** As in *Williams*, we

---

**[4]**To the extent our opinion in *Boxx v. Long Warrior*, 265 F.3d 771, 776 (9th Cir. 2001), states that *Montana's* first exception is limited to "commercial dealing, contracts, leases, or other arrangements" and that "such [other] arrangements also must be of a commercial nature," we disapprove the statement. We think the Court's list in *Montana* is illustrative rather than exclusive. Our holding in *Boxx*—that the tribal courts lack jurisdiction over a suit by an Indian plaintiff against a non-Indian defendant arising out of an automobile accident on non-Indian lands within the reservation—is not in question.

think it was "immaterial that [Smith] is not [a member]" once he chose to bring his action in tribal court. *Williams*, 358 U.S. at 223.

The Supreme Court has referred to *Montana's* principles as "pertain[ing] to subject-matter, rather than merely personal, jurisdiction." *Hicks*, 533 U.S. at 367 n.8; *see also Wilson v. Marchington*, 127 F.3d 805, 813 (9th Cir. 1997). The Court, however, has never defined Indian tribal "subject matter jurisdiction" with the same precision as we use that term when speaking of the subject matter jurisdiction vested and circumscribed by Article III. In the federal courts, "[s]ubject-matter jurisdiction . . . functions as a restriction on federal power, and contributes to the characterization of the federal sovereign." *Ins. Corp. of Ire. Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). As a consequence, parties to a suit in federal court "may not confer jurisdiction . . . by stipulation," *California v. LaRue*, 409 U.S. 109, 113 n.3 (1972), *abrogated on other grounds by 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 515 (1996), or other " 'prior action or consent of the parties,' " *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 377 n.21 (1978) (quoting *Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6, 17 (1951)). Indeed, even though Smith invoked the jurisdiction of the tribal courts, he may still challenge the court's subject matter jurisdiction on appeal. *See Am. Fire & Cas.,* 341 U.S. at 17-18; *Capron v. Van Noorden*, 6 U.S. (2 Cranch) 126 (1804).

In contrast to the strictures of federal court jurisdiction, "tribal adjudicatory jurisdiction over non-members is . . . illdefined." *Hicks*, 533 U.S. at 376 (Souter, J., concurring) (internal quotation marks omitted; alteration in original). In *Strate*, the Court observed that "in civil matters 'the existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative

or judicial decisions.' " 520 U.S. at 449 (quoting *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. at 855-56). More recently, in *Hicks*, the Court identified this "careful examination" *Hicks*, 533 U.S. at 399 (O'Connor, J., concurring), as "a proper balancing of state and tribal interests." *Id.* at 374.

The first *Montana* exception recognizes that tribes may exercise jurisdiction over nonmembers of the tribe who enter into "consensual relationships" with the tribe or its members. 450 U.S. at 565. Nonmembers of a tribe who choose to affiliate with the Indians or their tribes in this way may anticipate tribal jurisdiction when their contracts affect the tribe or its members. The principle comes with its own limitation: "A nonmember's consensual relationship in one area . . . does not trigger tribal civil authority in another . . . ." *Atkinson Trading*, 532 U.S. at 656. Thus, for example, by their mere presence within a reservation and their "actual or potential receipt of tribal police, fire, and medical services," nonmembers "ha[ve] not consented to the Tribes' adjudicatory authority." *Id.* at 655. Simply entering into some kind of relationship with the tribes or their members does not give the tribal courts general license to adjudicate claims involving a nonmember. *See Boxx v. Long Warrior*, 265 F.3d 771, 776 (9th Cir. 2001) (a non-Indian's "socially consensual" relationship with an Indian cannot serve as the basis for tribal civil jurisdiction).

The Court's "consensual relationship" analysis under *Montana* resembles the Court's Due Process Clause analysis for purposes of personal jurisdiction. "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations,' " the "constitutional touchstone" being "whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 319 (1945)). Thus, the " 'unilateral activity of

those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State;' " rather it must be "actions by the defendant *himself* that create a 'substantial connection.' " *Id.* at 474 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), and *McGee v. Int'l Life Ins.* Co., 355 U.S. 220, 223 (1957)). In its due process analysis, the Court has emphasized the need for "predictability to the legal system" so that the defendant can "reasonably anticipate being haled into court." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

We refer to the due process cases not to question whether the exercise of tribal civil jurisdiction is in fact subject matter jurisdiction, but to reinforce our observation that a jurisdictional analysis that includes a "proper balancing" of state and tribal interests employs a test more flexible than those defining the strict notions of subject matter jurisdiction under Article III. This is evident in the fact that the Court has held that "consensual relationships" may create jurisdiction, a holding inconsistent with federal subject matter jurisdiction, though perfectly consistent with principles of personal jurisdiction. *See Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1228-29 (9th Cir. 1989) (stating that "even if the consent of Stock West was adequate to confer personal jurisdiction onto the tribal court, the question of whether the tribal court has subject matter jurisdiction over the case would still not be resolved"; affirming dismissal of federal suit on grounds of comity). We know of no correlative doctrine or practice in the federal system that would allow a party who would not otherwise be subject to a federal court's subject matter jurisdiction to enter into a consensual relationship—for example, through contract or stipulation— that would confer subject matter jurisdiction on a federal court.

The play in the margins of tribal civil jurisdiction is further evident in the Court's decisions in *Iowa Mutual Insurance Co. v. LaPlante*, 480 U.S. 9 (1987), and *National Farmers Union*

*Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985). In both of those cases, a member of the tribe sued a nonmember in tribal court. Although the Court has since observed that it has "never held that a tribal court had jurisdiction over a nonmember defendant," *Hicks*, 533 U.S. at 358 n.2, in both cases the Court declined to hold that the tribal courts lacked jurisdiction over nonmember defendants. Instead the Court—for reasons of "prudential" exhaustion— remanded the cases to determine whether "the federal action should be stayed pending further Tribal Court proceedings or dismissed." *Iowa Mut.*, 480 U.S. at 20 n.14. In those cases, "[r]espect for tribal self-government made it appropriate 'to give the tribal court a "full opportunity to determine its own jurisdiction." ' " *Strate*, 520 U.S. at 451 (quoting *Iowa Mut.*, 480 U.S. at 16 (quoting *Nat'l Farmers*, 471 U.S. at 857)). Moreover, in those cases the Court expressly declined to extend the rule of *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978)—that tribal courts do not have *criminal* jurisdiction to punish non-Indians for offenses committed on the reservation—to tribal courts' *civil* jurisdiction. The Court explained that, "[i]f we were to apply the *Oliphant* rule here, it is plain that any exhaustion requirement would be completely foreclosed because federal courts would *always* be the only forums for civil actions against non-Indians." *Nat'l Farmers*, 471 U.S. at 854. That the Court declined to adopt the *Oliphant* rule and instead required exhaustion of jurisdiction challenges in the tribal courts necessarily implies that tribal courts retain some civil jurisdiction to decide cases involving nonmembers—"that the answer to the question whether a tribal court has the power to exercise civil subject-matter jurisdiction over non-Indians . . . . is not automatically foreclosed." *Id.* at 855; s*ee also Strate*, 520 U.S. at 449 (stating that "tribal courts have more extensive jurisdiction in civil cases than in criminal proceedings").

**[9]** "The power to exercise tribal civil authority over non-Indians derives not only from the tribe's inherent powers necessary to self-government and territorial management, but

also from the power to exclude nonmembers from tribal land." *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 592 (9th Cir. 1983) (citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141-44 (1982)). If the power to exclude implies the power to regulate those who enter tribal lands, the jurisdiction that results is a consequence of the deliberate actions of those who would enter tribal lands to engage in commerce with the Indians. It is true that "a tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe," *Merrion*, 455 U.S. at 142, but we think that no lesser principle should govern those who voluntarily enter a tribal courtroom seeking compensation from tribal members.[5] Indeed, there may be circumstances in which a nonmember plaintiff may have no forum other than the tribal courts in which to bring his claims.[6] We hold that a nonmember who knowingly enters tribal courts for

---

[5]We do not decide whether there are limits to the inherent authority of tribal courts in cases brought by nonmember plaintiffs. For example, must a state court recognize a judgment issued in a case brought by a nonmember plaintiff against a nonmember defendant that bore no relationship to the tribe or its lands? Of course, in such a case the tribe may circumscribe the adjudicative jurisdiction of its courts; or, the tribal courts may find that they have no interest in the claims and may decline jurisdiction. *See Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 448 (1952); WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW 201 (4th ed. 2004).

[6]There may be situations in which the tribal court has exclusive jurisdiction over the matter, so that if a nonmember plaintiff cannot bring suit against a member in tribal courts, there is no forum in which the case may be heard. *See Williams*, 358 U.S. at 223 (noting that state court had not accepted jurisdiction to hear suit between member and nonmember); *Winer v. Penny Enters., Inc.*, 674 N.W.2d 9 (N.D. 2004) (holding that the state lacked subject matter jurisdiction to hear a suit by a nonmember plaintiff against a member defendant arising out of an accident on a state road within the reservation); s*ee also Three Affiliated Tribes v. Wold Eng'g*, 467 U.S. 138, 148 (1984) (stating that "to the extent that [a prior North Dakota decision] permitted North Dakota state courts to exercise jurisdiction over claims by non-Indians against Indians . . . it intruded impermissibly on tribal self-governance"). We note that in this case there is concurrent jurisdiction between the tribal and state courts. *See Larrivee v. Morigeau*, 602 P.2d 563, 566-71 (Mont. 1979).

the purpose of filing suit against a tribal member has, by the act of filing his claims, entered into a "consensual relationship" with the tribe within the meaning of *Montana*.[7]

2

So long as the Indians "remain a 'separate people, with the power of regulating their internal and social relations,' . . . . [making] their own substantive law in internal matters, and . . . enforc[ing] that law in their own forums," tribal courts will be critical to Indian self-governance. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55-56 (1978) (citations omitted) (quoting *United States v. Kagama*, 118 U.S. 375, 381-82 (1886)); s*ee Iowa Mut.*, 480 U.S. at 14. The Tribes' system of tort is an important means by which the Tribes regulate the domestic and commercial relations of its members. Tort liability has historically been a means for compensating injured parties and punishing guilty parties for their willful or negligent acts.

Through his suit, Smith asked the Confederated Salish and Kootenai tribal court to discipline one of their own and order a tribal entity, SKC, to compensate him for the damages he

---

[7]The Tribes have expressly provided for those who wish to invoke the tribal court's jurisdiction:

> The Tribal Court of the Confederated Salish and Kootenai Tribes of the Flathead Reservation, Montana, shall have jurisdiction of all suits wherein the parties are subject to the jurisdiction of this Court, and over all other suits which are brought before the Court by stipulation of parties not otherwise subject to Tribal jurisdiction. In suits brought by non-members against members of the Tribes or other person subject to the jurisdiction of this Court, the complainant shall stipulate in his or her complaint that he or she is subject to the jurisdiction of the Tribal Court for purposes of any counterclaims which the defendant may have against him or her.

CSKT Laws Codified, tit. I, ch. 2, § 1-2-104(1), *available at* http://www.cskt.org/documents/laws-codified.pdf.

suffered allegedly at its hands. The Tribes have a strong interest in regulating the conduct of their members; it is part of what it means to be a tribal member. The Tribes plainly have an interest in compensating persons injured by their own; indeed, in this case, there were two members of the Confederated Salish and Kootenai tribes who also suffered allegedly because of SKC's negligent actions.

**[10]** If Smith has confidence in the tribal courts, we see no reason to forbid him from seeking compensation through the Tribes' judicial system. Had the jury awarded compensation to Smith, we have little doubt that we would not have entertained a claim by SKC that the tribal courts lacked jurisdiction to enter judgment against it and in favor of a tribal nonmember. Having made that choice, Smith cannot be heard to complain that the judgment was not in his favor.

## IV.   CONCLUSION

For the forgoing reasons, the judgment of the district court is

AFFIRMED.

---

GOULD, Circuit Judge, with whom RYMER and CALLAHAN, Circuit Judges, join, dissenting:

I would hold that the Tribal Court of the Confederated Salish and Kootenai Tribes did not have jurisdiction to adjudicate a claim involving Smith, a nonmember of the tribe. It is necessary to part company with the majority, for it parts company with compulsory Supreme Court guidance.

In *Montana v. United States*, 450 U.S. 544 (1981), the United States Supreme Court established the fundamental framework for considering whether a tribal court has jurisdic-

tion over a claim involving any nonmember of the tribe. Under the rule of *Montana*, federal courts must presume that tribal courts lack jurisdiction over lawsuits involving nonmembers unless one of two exceptions specified by the Supreme Court applies:

> A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Id.* at 565-66 (citations omitted). Because neither exception applies here, the Tribal Court of the Confederated Salish and Kootenai Tribes lacks jurisdiction to consider a claim involving Smith, a nonmember. In reaching a contrary conclusion, the majority errs and puts our circuit into conflict with recent Supreme Court jurisprudence on the jurisdiction of tribal courts over claims involving tribal nonmembers.

## I

The majority errs in its holding that the operation of the *Montana* framework depends on whether the nonmember party is a plaintiff or defendant. In particular, the majority concludes that the case of *Williams v. Lee*, 358 U.S. 217 (1959), provides for tribal jurisdiction whenever a nonmember plaintiff brings suit in tribal court against a member defendant. This reasoning cannot be reconciled with the holding of *Montana* and the fundamental change it wrought in determining whether tribal courts have jurisdiction over all claims involving nonmembers. The plain language of *Montana* indicates that its framework applies to legal actions involving

"nonmembers" without limitation, and this analysis has been repeated in subsequent Supreme Court cases. Moreover, in illustrating the application of the *Montana* framework, the Court has used *Williams* to illustrate examples of the *Montana* framework, indicating that nonmember plaintiffs, as well as nonmember defendants, fall within that doctrine. Indeed, the Supreme Court has stated that in *Strate v. A-1 Contractors*, 520 U.S. 438 (1997), it applied the *Montana* framework "without distinguishing between nonmember plaintiffs and nonmember defendants." *Nevada v. Hicks*, 533 U.S. 353, 358 n.2 (2001). Thus, in claiming that *Williams* compels an exception here to the *Montana* framework, the majority ignores not only the fundamental shift in tribal court jurisdiction that the Court implemented in *Montana*, but also the clear, unqualified language of recent Supreme Court cases considering the jurisdiction of tribal courts.

Whatever tension there may be between the language of *Williams* and the framework that the Supreme Court set forth in *Montana*, the Court itself has indicated that *Williams* is to be understood and interpreted as a part of the *Montana* framework, rather than a doctrine entirely separate from it. *See Montana*, 450 U.S. at 565-66 (citing *Williams* as an example of both exceptions).

## II

### A

The majority misapplies the holding of *Montana* in concluding that this case falls within the first *Montana* exception, governing "nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases or other arrangements." 450 U.S. at 565. Smith's filing of the cross-claim does not establish the relationship necessary to invoke the first exception because a party seeking to invoke tribal court jurisdiction must point not to a "consensual" court proceeding, but to "another *private*

*consensual* relationship." *Hicks*, 533 U.S. at 359 n.3. The cases that the Supreme Court has cited as illustrative of the first *Montana* exception reinforce the conclusion that the filing of a lawsuit, as Smith did in this case, is not the type of consensual, economic relationship that falls within the first *Montana* exception. *See, e.g.*, *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 153 (1980) (holding that a tribe may tax members entering the reservation to engage in economic activity); *Morris v. Hitchcock*, 194 U.S. 384, 393 (1904) (allowing a tribal permit tax on nonmember-owned livestock within the reservation); *Buster v. Wright*, 135 F. 947, 950 (8th Cir. 1905) (allowing a tribal permit tax on nonmembers seeking to conduct business within the reservation).

The majority suggests that the filing of a claim by a non-member plaintiff in *Williams* was cited by the Supreme Court "as an example of 'private individuals who voluntarily submitted themselves to tribal regulatory jurisdiction by the arrangements that they . . . entered into.' " Majority opinion, *ante* at 121. But the filing of a civil claim by a nonmember plaintiff was not given by the Supreme Court as an example of the first exception. More accurately, the Supreme Court in *Hicks* cited *Williams* as an example of the type of "private commercial actors" who enter into "consensual relationships," which may permit tribal jurisdiction under the first exception of *Montana*. *Hicks*, 533 U.S. at 372. In *Williams*, the plaintiff owned a store on the reservation, sold goods to the tribal member defendants on credit, and sued, in state court, to collect the debt. 358 U.S. at 217-18. It was in these circumstances that the Supreme Court explained that the plaintiff "was on the Reservation and the transaction with an Indian took place there." *Id.* at 223. Smith does not have any of the attributes of a "private commercial actor" and the filing of a cross-claim is not a "private consensual relationship" as the Supreme Court has interpreted the first exception. *Hicks*, 533 U.S. at 359 n.3; *Boxx v. Long Warrior*, 265 F.3d 771, 776 (9th Cir. 2001) ("Under *Montana*'s first exception, a relationship

is of the qualifying kind only if it is both consensual and entered into through commercial dealing, contracts, leases, or other arrangements.").

Although defendant Salish Kootenai College argues that the underlying relationship between the college and its students, including Smith, satisfies the requirement that there be a "consensual relationship" between the parties, the Supreme Court has rejected the theory that a relationship so attenuated from the underlying tort claim may provide the basis for tribal court jurisdiction. *Strate*, 520 U.S. at 457; *see also Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656 (2001). Accordingly, there is this point on which I agree with the majority: "Any contractual relationship Smith had with SKC as a result of his student status is too remote from his cause of action to serve as the basis for the Tribes' civil jurisdiction." Majority opinion, *ante* at 119.

**B**

The second *Montana* exception is also inapplicable here. The assertion of tribal court jurisdiction over a claim brought by a nonmember plaintiff against a member defendant does not concern "activity that directly affects the tribe's political integrity, economic security, health, or welfare." *Strate*, 520 U.S. at 446. More importantly, the Supreme Court has expressly rejected the argument that allowing nonmembers access to tribal court for civil litigation purposes falls within the second *Montana* exception. *Id.* at 459 ("Opening the Tribal Court for [a nonmember's] optional use is not necessary to protect tribal self-government . . . ." ). Not only is this Supreme Court language binding on us here, but, as with the first *Montana* exception, the cases the Court has used in illustrating the second *Montana* exception are far afield from the tort claims that Smith sought to have adjudicated in tribal court. *See Boxx*, 265 F.3d at 777 ("Even assuming that the Tribe possesses some regulatory and adjudicatory power over the sale and consumption of alcohol, the Tribe is not pre-

vented in any way from exercising such authority by being denied the right to adjudicate this garden variety automobile accident.")

The Supreme Court has noted that "key" to the proper application of the second exception is its preface: "Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members . . . . But [a tribe's inherent power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations." *Strate*, 520 U.S. at 459 (quoting *Montana*, 450 U.S. at 564) (alterations in original). Examples of circumstances that satisfy the second exception include adoption proceedings, *Fisher v. Dist. Ct. of Sixteenth Judicial Dist. of Mont.*, 424 U.S. 382, 387 (1976), and a "claim by a non-Indian merchant seeking payment from tribe members for goods bought on credit at an on-reservation store," *Strate*, 520 U.S. at 458 (describing the facts of *Williams*, 358 U.S. at 220). Smith may pursue his case in the state forum without threatening the political integrity or sovereignty of the tribe. *See Strate*, 520 U.S. at 459. The majority is incorrect in suggesting that Smith might fit within the second exception given by *Montana*.

### III

The majority also errs in holding that a party may waive lack of tribal court jurisdiction, much as a litigant in any court may waive lack of personal jurisdiction. The Supreme Court has rejected this reasoning, and has held that the "limitation on jurisdiction over nonmembers pertains to subject-matter, rather than merely personal, jurisdiction, since it turns upon whether the actions at issue in the litigation are regulable by the tribe." *Hicks*, 533 U.S. at 367 n.8. It bears repeating that the Supreme Court's statement in footnote 8 of the majority opinion of *Hicks*, penned by Justice Scalia and joined by five other Justices, that *Strate*'s "limitation on jurisdiction over

nonmembers" is a matter of "subject-matter, rather than personal, jurisdiction" is a holding of the Court, as the majority here indulges in "imaginative jurisprudence" with the effect to avoid the implications of this Supreme Court language and instead to chart a new doctrinal course. Tribal courts, however, are courts of limited, not general, subject-matter jurisdiction, and one area in which tribal courts presumptively lack jurisdiction is over claims involving nonmembers of the tribe. *Id.* at 366-68. The majority incorrectly adopts an unrestricted balancing of interests by analogy to the due process standards applicable to personal jurisdiction. But I cannot avoid concluding that here the majority sails on its own course through uncharted waters, rather than in the secure channels of *Montana*, *Strate*, and *Hicks* that have been marked by the Supreme Court.

There is a potential for injustice in any system that allows a party to bring a claim, lose on the merits, and then assert that the court lacked jurisdiction to adjudicate the matter at all, and doubtless this concern may motivate the majority. The problem of potential injustice, however, is not unique to the tribal court setting, but rather is inherent in any system that contains courts of limited jurisdiction, including the federal courts. There is a potential injustice in any case where we vacate a judgment and dismiss for lack of jurisdiction, but it is a necessary consequence of our law of jurisdiction and the concept of limited governmental power. Lack of subject-matter jurisdiction, whether in a federal court or in a tribal court, renders a judgment null and void, and a party may not escape from this long-established doctrine by claiming that a consent can confer jurisdiction on a court. Thus, it is surprising that the majority places such a dominant weight on the assent of Smith, rather than upon the required substantive analysis of the *Montana* exceptions.

## IV

In the broader context of tribal court jurisdiction, voluntary attendance at a community college cannot be considered a

consent to tribal court jurisdiction on tort claims arising out of that relationship. The majority, moreover, cannot point to any way in which adjudicating this tort claim in tribal court is " 'necessary to protect tribal self-government or to control internal relations.' " *Id.* at 359 (quoting *Montana*, 450 U.S. at 564) (emphasis omitted). It would be wrong to think that tribal jurisdiction over nonmembers on tort claims is a necessary incident of tribal sovereignty. Neither of the *Montana* exceptions, as construed by binding Supreme Court precedent, applies to the situation here and, therefore, the exercise of tribal jurisdiction over nonmember Smith was not correct. I respectfully dissent, believing that we are bound by *Montana* and its progeny to reverse the judgment of the district court.