**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PHILIP MORRIS USA, INC.,
     *Plaintiff-Appellant,*

v.

KING MOUNTAIN TOBACCO
COMPANY, INC.; MOUNTAIN
TOBACCO; DELBERT L. WHEELER,
SR.; RICHARD KIP RAMSEY,
     *Defendants-Appellees.*

No. 06-36066

D.C. No.
CV-06-03073-RHW

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Robert H. Whaley, District Judge, Presiding

Argued and Submitted
May 10, 2007—Seattle, Washington

Filed January 20, 2009

Before: Melvin Brunetti, M. Margaret McKeown, and
William A. Fletcher, Circuit Judges.

Opinion by Judge McKeown;
Concurrence by Judge William A. Fletcher

719

---

**COUNSEL**

Daniel P. Collins, Munger, Tolles & Olson LLP, Los Angeles, California, for the plaintiff-appellant.

J. Michael Keyes, Theresa L. Keyes, and Bart J. Freedman, Kirkpatrick & Lockhart Preston Gates Ellis LLP, Spokane, Washington, for the defendants-appellees.

---

**OPINION**

McKEOWN, Circuit Judge:

This case is yet another of the difficult Indian jurisdiction cases considered by this court. The precise question presented

is whether there is colorable tribal court jurisdiction over a nonmember's federal trademark and related state law claims against tribal defendants for alleged passing off of cigarettes on the Internet, on the reservation of another tribe, and elsewhere. Philip Morris USA, Inc. manufactures and markets Marlboro cigarettes, one of the most recognized brands in the United States. King Mountain Tobacco Company, Inc., a tribal corporation on the Yakama Indian Reservation, along with Delbert L. Wheeler, Sr. and Richard "Kip" Ramsey, company founders and members of the tribe (collectively, "King Mountain"), sell King Mountain cigarettes in packaging that Philip Morris claims infringes and dilutes its trademarks and trade dress.

We are faced with dueling lawsuits. Philip Morris sued King Mountain in federal court, alleging various federal and state law claims and seeking, among other things, injunctive relief against King Mountain's continued sale of its products. King Mountain followed with an action for declaratory relief against Philip Morris in Yakama Tribal Court, which prompted Philip Morris to seek an injunction in federal court against the tribal proceedings. King Mountain asked the district court to stay its proceedings pending the Tribal Court's determination of its jurisdiction.

The district court granted King Mountain's requested stay, concluding there was a colorable claim to tribal court jurisdiction under the formulations found in *Montana v. United States*, 450 U.S. 544 (1981), *Strate v. A-1 Contractors*, 520 U.S. 438 (1997), and *Nevada v. Hicks*, 533 U.S. 353 (2001). We agree that these cases provide the foundation for our analysis, but we disagree that they point to a colorable claim of jurisdiction. Rather, we conclude that the Tribal Court does not have colorable jurisdiction over nonmember Philip Morris's federal and state claims for trademark infringement on the Internet and beyond the reservation.

### FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

Philip Morris, the maker of Marlboro-brand cigarettes, claims that Marlboro is the most well-known and best-selling brand of cigarettes. Philip Morris sells Marlboro cigarettes throughout the United States and the world, including to stores on the Yakama Reservation. Philip Morris contracts directly with some of these stores, while others obtain its products through distributors.

Delbert Wheeler and Richard "Kip" Ramsey are both enrolled members of the Yakama Indian Nation. Together they own Mountain Tobacco Company, d/b/a King Mountain Tobacco Company, Inc., which is a corporation that was formed and licensed under the laws of the Yakama Indian Nation in 2004. King Mountain began selling cigarettes to stores on the Yakama Reservation in early 2006, and shortly thereafter to members of other Indian tribes, including the Onodaga Nation and Seneca Tribe in New York, via phone and mail orders. King Mountain cigarettes are also sold to the general public via the Internet, through websites such as www.cheap-cig.com and www.123smoke.com, but King Mountain denies that it markets its cigarettes on the Internet or sells directly to those that do. There is no contractual or other relationship between King Mountain and Philip Morris.

Philip Morris's Marlboro packaging bears a distinctive "red roof" design, featuring two red triangles filling the top corners of its otherwise white package such that there is a white peak with red above it. King Mountain's cigarette packages feature an image of a snowcovered mountain against a red backdrop. Several aspects of Philip Morris's package design are registered with the United States Patent and Trademark Office ("the USPTO"). Registration Nos. 938,510; 1,544,782; and 1,038,989.



Philip Morris claims that the appearance of King Mountain's packaging is a close copy or imitation of its Marlboro packaging such that consumers are both actually and likely to be confused, that Philip Morris's Marlboro trademark is infringed and diluted, and alleges that its reputation is tarnished. King Mountain, on the other hand, argues that its packaging depicts Mt. Adams—known as "Pahto" in the Yakama Nation—a mountain of spiritual and cultural significance to the Yakama Tribe and that any resemblance to Philip Morris's packaging is inadvertent and incidental. King Mountain applied to register its package design but the USPTO refused registration, citing two of Philip Morris's registrations.

Philip Morris filed suit against King Mountain in federal district court, alleging violations of the Lanham Act and Washington state law. The amended complaint includes claims for trademark infringement, trade dress infringement, trademark dilution, and unfair competition.

King Mountain responded by filing an action for declaratory relief in the Yakama Tribal Court, claiming that Philip Morris "[had] come upon the reservation to do business without permission of the Yakama Indian Nation, [was] not licensed thereby, and in so doing . . . submitted itself to the jurisdiction of the Yakama Tribal Court." King Mountain sought a declaration that it was not infringing Philip Morris's trademark and trade dress and further alleged that Philip Morris's actions violated the Yakama Treaty of 1855. Once it received notice of this tribal court action, Philip Morris sought an injunction in federal court against those proceedings.

In response to Philip Morris's effort to enjoin King Mountain's continued use of its packaging, King Mountain argued that Philip Morris had failed to exhaust tribal remedies, and that it had not shown a likelihood of success on the merits of the Lanham Act claims. The district court denied Philip Morris's requested injunctions and granted King Mountain's motion to stay the federal case to allow the Tribal Court to address its own jurisdiction. The district court reasoned, relying on *Stock West Corp. v. Taylor*, 964 F.2d 912, 919 (9th Cir. 1992) (*en banc*), that "abstention is appropriate where there exists a 'colorable question' whether the tribal court has jurisdiction over the asserted claims." The court framed the question as whether "the Yakama Indian Nation could regulate the activities at issue in this case" and concluded that "[i]t is not clear that the tribe would not have regulatory authority over trademarks . . . ." The court also concluded that it is not clear "whether tribal courts have adjudicative authority to address trademark claims against tribal members whose conduct occurred on reservation lands." In light of these uncertainties, the district court held there was a colorable question of the existence of tribal court jurisdiction over the case.

On appeal from this order, Philip Morris argues that the court improperly denied its motions for injunctions and erred in granting King Mountain's motion to stay the district court proceedings. We have jurisdiction under 28 U.S.C.

§ 1292(a)(1) to review the order denying these injunctions and granting the motion to stay the proceedings. *Agcaoili v. Gustafson*, 870 F.2d 462, 463 (9th Cir. 1989) (holding that jurisdiction over appeal from grant of motion to stay is proper under 28 U.S.C. § 1292(a)(1)).

## ANALYSIS

Tribal jurisdiction cases are not easily encapsulated, nor do they lend themselves to simplified analysis. The Supreme Court itself observed that questions of jurisdiction over Indians and Indian country are a "complex patchwork of federal, state, and tribal law." *Duro v. Reina*, 495 U.S. 676, 680 n.1 (1990). And we have acknowledged that "[t]here is no simple test for determining whether tribal court jurisdiction exists." *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1228 (9th Cir. 1989). Despite these complications, the answer to the tribal jurisdiction question in this case can be divined in a logical fashion from the teachings of three Supreme Court cases: *Montana*, S*trate*, and *Hicks*. These teachings are affirmed in important respects by the Court's most recent tribal jurisdiction decision in *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 128 S. Ct. 2709 (2008).

These cases provide the foundation for the following guiding principles. In considering tribal jurisdiction, we look first to the member or nonmember status of the unconsenting party, which is, in this case, Philip Morris, a nonmember. *Hicks*, 533 U.S. at 382 (Souter, J., concurring) ("It is the membership status of the unconsenting party, not the status of real property, that counts as the primary jurisdictional fact."). "As to nonmembers . . . a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction." *Strate*, 520 U.S. at 453.

Apart from treaties, there are two potential sources of tribal jurisdiction: a tribe's inherent sovereignty and congressional

statutory grant. In general, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana*. 450 U.S. at 565. This restriction is "subject to two exceptions: The first exception relates to non-members who enter consensual relationships with the tribe or its members; the second concerns activity that directly affects the tribe's political integrity, economic security, health, or welfare." *Strate*, 520 U.S. at 446.

If neither of the *Montana* exceptions is applicable, we consider "whether such regulatory jurisdiction has been congressionally conferred." *Hicks*, 533 U.S. at 360. Tribal courts are not, however, courts of general jurisdiction, and a mere failure to affirmatively preclude tribal jurisdiction in a statute does not amount to a congressional expansion of tribal jurisdiction. *Id.* at 367 ("[The] historical and constitutional assumption of concurrent state-court jurisdiction over federal-law cases is completely missing with respect to tribal courts. . . . Tribal courts, it should be clear, cannot be courts of general jurisdiction in this sense. . . ."). Finally, tribal jurisdiction is, of course, cabined by geography: The jurisdiction of tribal courts does not extend beyond tribal boundaries. *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 658 n.12 (2001).

Taking these principles together, we conclude that the Yakama Tribal Court does not have colorable jurisdiction over King Mountain's tribal action for declaratory relief insofar as it implicates Philip Morris's federal trademark infringement claims against King Mountain and its principals, members of the Yakama Tribe. Thus, exhaustion would "serve no purpose other than delay." *Strate*, 520 U.S. at 460 n.14.[1] To understand the basis for this conclusion beyond the summary principles cited above, it is useful to begin with an explication of the Supreme Court's decision in *Montana* and trace its application through *Strate* and *Hicks*.

---

[1] We review de novo the question whether exhaustion of tribal court remedies is required. *Boozer v. Wilder*, 381 F.3d 931, 934 (9th Cir. 2004).

## I.   THE *MONTANA* RULE AND ITS PROGENY

**[1]** In *Montana*, in considering a tribe's authority to impose hunting and fishing restrictions on nonmembers within the reservation, the Supreme Court examined the scope of tribes' legislative power stemming from their inherent sovereignty, and found it narrowly limited with respect to nonmembers. The "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Montana*, 450 U.S. at 564. From this observation, the Court deduced "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.* at 565.

**[2]** "To be sure," the Court noted, "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." *Id.* First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* (citing *Williams v. Lee*, 358 U.S. 217 (1959), and other cases). Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566 (again citing *Williams*, 358 U.S. 217, and other cases). Outside of these two exceptions, as the Court emphasized in *Montana*, the tribes' inherent sovereignty does not give them jurisdiction to regulate the activities of nonmembers. *See Plains Commerce Bank*, 128 S. Ct. at 2720 ("Given *Montana*'s general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe, efforts by a tribe to regulate

nonmembers, especially on non-Indian fee land, are presumptively invalid.") (internal quotations and citations omitted).

While delineating the scope of tribes' regulatory jurisdiction over nonmembers, *Montana* did not directly address the scope of tribes' adjudicatory jurisdiction. The Supreme Court turned to the question of tribal adjudicative jurisdiction sixteen years later in *Strate*. *Strate* arose out of a traffic accident between two nonmembers that occurred on a state highway running through the reservation. In support of tribal court jurisdiction, the plaintiff argued that *Montana* did not apply, because it only addressed the regulatory jurisdiction of tribes, not their adjudicatory jurisdiction. In rejecting this argument, the Court noted that "[w]hile *Montana* immediately involved regulatory authority, the Court broadly addressed the concept of 'inherent sovereignty.' " *Strate*, 520 U.S. at 453 (quoting *Montana*, 450 U.S. at 563). "As to nonmembers," it held that "a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction. Absent congressional direction enlarging tribal-court jurisdiction, we adhere to that understanding. Subject to controlling provisions in treaties and statutes, and the two exceptions identified in *Montana*, the civil authority of Indian tribes and their courts with respect to non-Indian fee lands generally 'do[es] not extend to the activities of nonmembers of the tribe.' " *Id.* (quoting *Montana*, 450 U.S. at 565) (alteration in original). While leaving open whether tribes' adjudicative jurisdiction over nonmembers is narrower than the legislative jurisdiction delineated in *Montana*, the Court made clear in *Strate* that it is, at least, no broader.

Finally, in *Hicks*, the Court confronted the issue of tribal adjudicative jurisdiction over nonmembers stemming not from the tribe's inherent sovereignty, the focus of *Montana*, but from a congressional grant. The plaintiff in *Hicks* was a tribal member who sued nonmember state officials under a federal statute, 42 U.S.C. § 1983. After concluding the tribal court did not have jurisdiction arising from its inherent sovereignty under the *Montana* framework, the Court addressed the

argument that tribal courts are courts of general jurisdiction and thus fully capable of adjudicating § 1983 claims. The Court firmly rejected this position, reasoning that the "historical and constitutional assumption of concurrent state-court jurisdiction over federal-law cases is completely missing with respect to tribal courts." *Hicks*, 533 U.S. at 367. It then turned to whether the federal statute gave the tribe jurisdiction: "It is true that some statutes proclaim tribal-court jurisdiction over certain questions of federal law . . . . [But] no provision in federal law provides for tribal-court jurisdiction over § 1983 actions." *Id.* at 367-68. The Court went on to note that tribal jurisdiction over § 1983 suits would be problematic, because the federal removal statute did not provide for removal from tribal court, which would deny those sued in tribal court the right to a federal forum that they would otherwise enjoy. *Id.* at 368.

**[3]** From these three foundational Supreme Court cases, we can discern the ground rules governing tribal adjudicatory jurisdiction over nonmembers. As a general rule, tribes do not have jurisdiction, either legislative or adjudicative, over nonmembers, and tribal courts are not courts of general jurisdiction. Nevertheless, stemming from their inherent sovereignty, tribes do have legislative jurisdiction within the two *Montana* exceptions. The *Montana* framework is applicable to tribal adjudicative jurisdiction, which extends no further than the *Montana* exceptions. Beyond the jurisdiction they enjoy from their inherent sovereignty, tribes may also be granted jurisdiction via treaty or congressional statute.

## II. Application of Tribal Jurisdiction Principles

### A. The *Montana* Exceptions

The evolution of the Supreme Court's jurisprudence leaves us with the firm conclusion that we should begin our analysis under *Montana*. While it is unclear whether meeting the *Montana* exceptions is sufficient for tribal court jurisdiction—that

is, whether tribal adjudicative jurisdiction extends to the boundary of tribal legislative jurisdiction—we have no doubt that it is necessary.

King Mountain, however, argues that *Montana* is not applicable to this case, either in its general rule or its exceptions. Rather, King Mountain takes the position that *Montana* only applies to suits involving the activities of nonmembers, i.e., suits with nonmember defendants, whereas King Mountain's tribal action for declaratory relief effectively involves a tribal member defending the lawfulness of its activities against the claims of a nonmember, de facto plaintiff. While it is true that the Supreme Court has never applied *Montana* to a case involving a tribal defendant, *Montana* itself, as well as subsequent Supreme Court and Ninth Circuit precedents, supports our conclusion that the *Montana* framework is the starting point for suits involving nonmembers generally, whether as plaintiffs or defendants.

In *Montana*, the Court cited *Williams*, 358 U.S. 217, as exemplifying each of the two exceptions to its general rule. Importantly, *Williams* involved a suit by a nonmember against a member of the Navajo tribe to collect for goods allegedly purchased on credit from the plaintiff's shop within the Navajo Reservation. In other words, *Williams* involved a member defendant and the activities of that member defendant. If, as King Mountain suggests, *Montana* does not apply to such cases at all, it is inconceivable that the Court would have chosen *Williams* to illustrate *Montana*'s exceptions. The soundness of this reasoning was confirmed in *Plans Commerce Bank*, where the Court said: "We cited four cases in explanation of *Montana*'s first exception [including *Williams*]. Each involved regulation of non-Indian activities on the reservation that had a discernable effect on the tribe or its members." 128 S. Ct. 2721. And, as noted earlier, in cases involving nonmembers, the inquiry focuses primarily on whether a nonmember is being haled into tribal court against his will, not whether the party is the plaintiff or defendant. *See, e.g.*, *Hicks*,

533 U.S. at 382 (Souter, J., concurring) ("It is the membership status of the unconsenting party . . . that counts as the primary jurisdictional fact."). This approach does not, however, mean that party alignment is not an important factor in the appropriate case.[2]

Although the Supreme Court has never had occasion to consider the *Montana* exceptions vis-à-vis a tribal defendant, that fact seems more indicative of the unusual procedural posture of this case than the scope of *Montana*'s rule. Questions of exhaustion and tribal jurisdiction typically, although not always, arise where a tribal member first sues a nonmember in tribal court, the nonmember seeks a stay against the tribal proceedings in federal court, and the federal court must then decide whether to defer to the tribal court out of principles of comity. This case does not follow this pattern. Rather, here it was only after being sued in federal court by Philip Morris, the nonmember plaintiff, that King Mountain, the member defendant, filed suit in tribal court and invoked tribal court jurisdiction. Tellingly, the only case the Supreme Court has encountered with a similar procedural posture to this one was *Williams*, the very case it cited as exemplifying *Montana*'s exceptions.

---

[2]Although Judge Fletcher insists that we seek to undermine *Williams* and are unfaithful to *Smith v. Salish Kootenai College*, 434 F.3d 1127, 1131 (9th Cir. 2006) (*en banc*), his criticism is without justification. We faithfully follow *Smith*, which applied *Williams* within the *Montana* framework in concluding that tribal court jurisdiction existed over a nonmember's suit concerning on-reservation conduct. *See id.* at 1137-40. In *Smith*, the nonmember's status as a plaintiff was crucial: "We hold that a nonmember who knowingly enters tribal courts for the purpose of filing suit against a tribal member has, by the act of filing his claims, entered into a 'consensual relationship' with the tribe within the meaning of *Montana*." *Id.* at 1140. By contrast, Philip Morris does not consent to tribal court jurisdiction, regardless of its party alignment as defendant and de facto plaintiff. Significantly, we do not conclude that party alignment is "unimportant," Fletcher Concurrence at 747; rather, because Philip Morris is unconsenting, its nonmember status is the "primary jurisdictional fact," *Hicks*, 533 U.S. at 382 (Souter, J., concurring).

**[4]** Finally, it is significant that this court, sitting *en banc*, recently invoked the *Montana* analysis in just such a case. *Smith v. Salish Kootenai College*, 434 F.3d 1127, 1131 (9th Cir. 2006) (*en banc*) (holding exhaustion required in light of a colorable claim to tribal jurisdiction based on the first *Montana* exception). *Smith* concerned a tort claim by a student against Salish Kootenai College arising out of a traffic accident on a federal highway within the Flathead Reservation, a reservation controlled by the Confederated Salish and Kootenai Tribes. *Id.* at 1129. Smith, the putative plaintiff, was a member of the Umatilla Tribe and thus was considered a nonmember for jurisdictional purposes. *Id.* at 1132-33. The college was a tribal entity, and thus was treated as a member for jurisdictional purposes. *Id.* at 1135. Notwithstanding the presence of a member defendant and nonmember plaintiff, we applied *Montana*. *Id.* at 1130. Thus, in this circuit, the *Montana* analysis is controlling in tribal jurisdiction cases, regardless of the alignment of the member and nonmember parties. This is not to say that whether the nonmember is a plaintiff or defendant is irrelevant to the analysis, but only that the analysis must take place within the *Montana* framework, with party alignment in the tribal court action as the most important factor to be weighed in determining the application of *Montana*'s rule and exceptions to the case at hand. *See Smith*, 434 F.3d at 1131 ("First, and most important, is the party status of the nonmember; that is, whether the nonmember party is a plaintiff or defendant . . . . The Court has repeatedly demonstrated its concern that tribal courts not require [nonmember defendants] to defend themselves against ordinary claims in an unfamiliar court." (internal quotation marks and original brackets omitted)).

**[5]** We turn, then, to the *Montana* exceptions themselves. Any initial impression that this case falls within the first *Montana* exception fades quickly upon closer inspection. Under that exception, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members,

through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565. Philip Morris acknowledges that as part of its business, it has consensual relationships with tribal members. Stores located on the reservation and operated by tribal members sell Marlboro cigarettes. Although the stores purchase from distributors rather than from Philip Morris, they have marketing arrangements with Philip Morris. The first question, however, is whether there is a contract or consensual relationship between Philip Morris and King Mountain, the tribal member. The answer is undisputably no. Philip Morris has no consensual commercial relationship with King Mountain; rather, they are market competitors. Nor has Philip Morris otherwise consented to tribal jurisdiction by voluntarily litigating its infringement claims against King Mountain in tribal court. *Cf. Smith*, 434 F.3d at 1136 (holding Montana's first exception was satisfied because the nonmember consented to tribal jurisdiction by choosing to file his claims against a tribal member in tribal court). Philip Morris filed its claims in federal court and has been haled into tribal court only as an unconsenting, de facto plaintiff in King Mountain's tribal action for declaratory relief.

So, taking the question one step further, we ask whether there is a nexus between Philip Morris's commercial relationship with various stores operated by tribal members and the events that give rise to this suit for trademark infringement. *See Atkinson*, 532 U.S. at 656 (holding that *Montana* requires not only contacts, but contacts related to the events out of which the suit arises). We hold there is not.

The mere fact that a nonmember has some consensual commercial contacts with a tribe does not mean that the tribe has jurisdiction over all suits involving that nonmember, or even over all such suits that arise within the reservation; the suit must also arise out of those consensual contacts. In *Atkinson*, the Supreme Court clarified that "[a] nonmember's consensual relationship in one area . . . does not trigger tribal civil

authority in another—it is not 'in for a penny, in for a Pound." *Atkinson*, 532 U.S. at 656 (citation omitted); *see also Strate*, 520 U.S. at 457 (holding *Montana*'s first exception inapplicable despite consensual commercial relationship with the tribe, because the claim was unrelated to that relationship). "*Montana*'s consensual relationship exception requires that the tax or regulation imposed by the Indian tribe have a nexus to the consensual relationship itself." *Atkinson*, 532 U.S. at 656.

In *Atkinson*, the Navajo Tribe sought to collect a hotel tax from all guests at hotels within the reservation boundaries. Although the tax would be imposed directly on guests, hotel owners and operators were charged with collecting it. Atkinson, a nonmember proprietor of a hotel located within the boundaries of the reservation, brought suit to enjoin the tax. The Supreme Court noted that Atkinson's acquisition of a license to transact business within the reservation put him in a consensual commercial relationship with the tribe. Nevertheless, this relationship was not enough to support tribal jurisdiction under the first *Montana* exception, because the tribe did not seek to impose the tax on activities arising out of that relationship. *Id.* at 656. Rather, the tribe sought to tax the activities of the guests, namely staying overnight in a hotel. Thus, the Court held, "it is clear that petitioner's 'Indian trader' status by itself cannot support the imposition of the hotel occupancy tax." *Id.*

The Court reached a similar conclusion in *Strate*. There, the plaintiff was involved in a traffic accident with a nonmember subcontractor of a tribal corporation who "was on the reservation to perform landscaping work for the Three Affiliated Tribes at the time of the accident . . . ." *Atkinson*, 532 U.S. at 656. The plaintiff sued in tribal court, claiming jurisdiction under the first *Montana* exception, but the Court determined the tribal court was without jurisdiction. It held that "[a]lthough [the subcontractor] was engaged in subcontract work on the Fort Berthold Reservation, and therefore had a consensual relationship with the Tribes, [the plaintiff] was not

a party to the subcontract, and the Tribes were strangers to the accident." *Strate*, 520 U.S. at 457 (internal quotations omitted).

[6] Here we face a similar situation. King Mountain claims tribal jurisdiction exists over this suit under the first *Montana* exception, and it points to Philip Morris's sales and contracts with stores within the reservation for the requisite consensual commercial relationship. The fatal flaw with this position is the same as that in *Atkinson* and *Strate*: there is no nexus between these contacts and the activity giving rise to this lawsuit. *Atkinson* teaches that under the first *Montana* exception, a tribe has authority to tax a nonmember where the tax has a nexus to the "consensual relationship." In extending the *Montana* framework to the question of a tribal court's adjudicative jurisdiction, we hold that a tribal court has jurisdiction over a nonmember only where the claim has a nexus to the consensual relationship between the nonmember and the disputed commercial contacts with the tribe.

[7] This suit is not about the marketing contracts between Philip Morris and a handful of stores on the reservation. Indeed, King Mountain is not a party to any of these contracts, nor does it allege any sort of consensual relationship with Philip Morris. Rather, the suit is about nationwide sales, including on the Internet and on other reservations, of King Mountain cigarettes. As in *Strate*, the tribal stores are "strangers" to the trademark infringement claim.

[8] King Mountain's argument that both Philip Morris's contacts with the tribe and the conduct complained of involve the sale of cigarettes is not unlike the tribe's argument in *Atkinson*. There, the tribe took the view that it could force a hotel owner to collect a tax, because he had a license to operate a hotel and the tax involved hotel guests. While the subject matter was loosely the same, the required relationship between the two scenarios was missing. The acts out of which this Lanham Act suit arises are completely independent of

Philip Morris's contacts with the tribe. Even if Philip Morris had never entered into these relationships, its lawsuit would be exactly the same. Unlike a breach of contract claim where the unconsenting party was also a party to the contract, *see Williams*, 358 U.S. at 217-18, or a misrepresentation and malpractice claim against a tribe's legal representative, *see Stock West*, 964 F.2d at 914-16, the acts complained of do not arise out of the nonconsenting party's contacts with the tribe. This case, therefore, falls outside of *Montana*'s first exception.

Finally, it bears noting that this case is distinguishable from other cases by virtue of the breadth of the challenged activity. Virtually all of the cases that have held tribal exhaustion is required have concerned a single incident occurring on or near tribal land or a contract directly with a tribal member. *See e.g.*, *Strate*, 520 U.S. at 442 (car accident); *Williams*, 358 U.S. at 217-18 (unpaid bill). In contrast, this is a suit by the holder of a federally-registered trademark for trademark infringement, unfair competition, and passing off through worldwide Internet sales and off-reservation sales to tribes in New York. The focus of the complaint is the passing off, which occurs beyond the reservation boundaries and, according to *Atkinson*, beyond tribal jurisdiction. *See also Plains Commerce Bank*, 128 S. Ct. at 2719-20 (emphasizing that tribal sovereignty stems from the tribes' rights to control their land, and does not extend beyond reservation boundaries). Even though King Mountain disclaims direct responsibility for the sales, the complaint is against the presence of its cigarettes in the nationwide market. That King Mountain may also sell its cigarettes on the reservation does not alter the nationwide geographic scope of Philip Morris's claims.

**[9]** As for the second exception, the claims in this case are not of the type the Court had in mind when it carved out an exception for tribal jurisdiction over "conduct [that] threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," *Montana*, 450 U.S. at 566. The Yakama Tribe is not itself a party

to this case. To some extent, it can be argued that torts committed by or against Indians on Indian land always "threaten[ ] or ha[ve] some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* But this generalized threat that torts by or against its members pose for any society, is not what the second *Montana* exception is intended to capture. *See Atkinson*, 532 U.S. at 657 n.12 ("*Montana*'s second exception can be misperceived. The exception is only triggered by *nonmember conduct* that threatens the Indian tribe; it does not broadly permit the exercise of civil authority wherever it might be considered necessary to self-government." (internal quotations omitted)). Rather, the second exception envisions situations where the conduct of the nonmember poses a direct threat to tribal sovereignty. *Id.* Pursuit of federal and state trademark claims hardly poses a threat of that nature.

It appears that in analyzing tribal sovereignty the district court imported a general notion of tribal regulatory authority unhinged from the *Montana* exceptions. The district court predicated its holding on the possibility of general tribal authority to regulate trademarks. But the question of tribal regulatory authority over nonmembers is linked, under *Montana*, to the two specific exceptions, not to a broad notion of regulatory authority.

**[10]** Whether the tribe may adopt its own trademark system is not at issue here. But surely the district court is not suggesting that the tribe would have regulatory authority over federal trademark registration. Significantly, Philip Morris holds federal trademarks and trade dress registered under the Lanham Act, trademarks whose validity King Mountain apparently challenges. *See* 15 U.S.C. § 1119 (under federal law, the courts and the Patent and Trademark Office have concurrent jurisdiction over cancellation proceedings: "the court may determine the right to registration, order the cancellation of registrations . . . and otherwise rectify the register with respect to the registrations of any party to the action"). The presence

of this federal regulatory scheme highlights a further complication and underscores why the inquiry must be tethered to *Montana*.

### B.   *HICKS* AND THE LANHAM ACT

Although the Tribal Court has no jurisdiction over this case arising from its inherent sovereignty, because it does not fall within either of the *Montana* exceptions, *Hicks* leaves open a second basis for tribal jurisdiction: a congressional statutory grant.

**[11]** *Hicks* examined whether tribal courts have jurisdiction to entertain federal claims under 42 U.S.C. § 1983. In rejecting the claim that tribal courts are courts of general jurisdiction and thus are an appropriate venue for federal civil rights claims, the Court deemed that contention "quite wrong" and reiterated that, unlike state courts of general jurisdiction, "a tribe's inherent adjudicative jurisdiction over nonmembers is at most only as broad as its legislative jurisdiction." *Hicks*, 533 U.S. at 367. The Court resolved that Congress did not enlarge tribal-court jurisdiction vis-à-vis § 1983.

**[12]** Applying the same principles to the Lanham Act, we conclude that the Lanham Act "is not such an enlargement." *Id.* at 366 n.7. Nothing in the Lanham Act suggests that it was intended by Congress to expand tribal jurisdiction. In fact, the Act makes no mention of tribes at all. *Hicks* noted with respect to § 1983, "tribal-court jurisdiction would create serious anomalies" including the inability to exercise removal options. *Id.* at 368. A further sovereignty anomaly would be created under the Lanham Act because of the courts' ability to cancel a federally-granted trademark, *see* 15 U.S.C.§ 1119, an historical and constitutional interplay between federal law and state-court jurisdiction that "is completely missing with respect to tribal courts." *Hicks*, 533 U.S. at 367. Philip Morris argues that tribes never have jurisdiction over federal statutory claims, unless Congress explicitly grants it to them. King

Mountain argues that Tribal Courts always have jurisdiction over such claims, unless Congress explicitly precludes it. Both of these positions misread *Hicks*; Congress may, via statute, expand or contract tribal jurisdiction, but where Congress is silent—as in the Lanham Act—tribal jurisdiction rests on inherent sovereignty, and its scope is prescribed by *Montana*. *Hicks* does not, as Philip Morris suggests, stand for a rule that tribes have no jurisdiction over federal statutory claims absent an explicit statutory grant. *Hicks* therefore provides no additional basis for or against tribal jurisdiction in this case.

## CONCLUSION

[13] For the above reasons, we hold that the Yakama Tribal Court has no colorable claim to jurisdiction over this dispute.[3] Given the circumstances, exhaustion of Philip Morris's claims would serve no purpose beyond delay, and is therefore inappropriate. *Hicks*, 533 U.S. at 369.

## REVERSED AND REMANDED.

---

[3]Philip Morris's complaint does not allege claims based on King Mountain's sales of its cigarettes on the Yakama Reservation, although there are passing references to such sales in later pleadings. To the extent that Philip Morris challenges King Mountain's sales activities to stores on the reservation, tribal court exhaustion would be appropriate as to those claims, as there would be a colorable claim that Philip Morris's voluntary decision to sell its cigarettes within the Reservation supplies the requisite voluntary commercial relationship to meet *Montana*'s first exception with respect to claims arising in that market. *Cf. Smith*, 434 F.3d at 1132 ("where the nonmembers are the *plaintiffs*, and the claims arise out of commercial activities within the reservation, the tribal courts may exercise civil jurisdiction"); *see also Ford Motor Co. v. Todecheene*, 488 F.3d 1215, 1217 (9th Cir. 2007) ("[a party] will be deemed to have exhausted its tribal remedies once the [tribe's highest court] either resolves the jurisdictional issue or denies a petition of discretionary interlocutory review pursuant to [tribal law.]").

W. FLETCHER, Circuit Judge, concurring in judgment:

I concur in the judgment.

King Mountain Tobacco Company, Inc., and Yakama Tribe members Delbert Wheeler and Richard "Kip" Ramsey (collectively, "tribal member defendants" or "defendants") allegedly infringed federal and state trademark rights of Philip Morris by selling cigarettes with packaging and designs that resemble those of Philip Morris's flagship Marlboro brand. Philip Morris sued the defendants in federal district court for trademark infringement. The defendants responded by suing Philip Morris in tribal court, seeking a declaratory judgment that their packaging, designs, and sales do not infringe. The tribal member defendants are actual defendants in the district court coercive suit and de facto defendants in the tribal court declaratory judgment suit. *See Skelly Oil v. Phillips Petroleum Co.*, 339 U.S. 667 (1950).

The district court appears to have thought that sales both on and off the Yakama Reservation are at issue in this case. The district court noted in its order granting the stay that "Defendants began selling King Mountain cigarettes to smoke shops on the Yakama Reservation in January 2006" and later began to make off-reservation sales. The district court concluded that because Philip Morris's federal court suit made "claims against tribal members whose conduct occurred on reservation lands . . . there exists a colorable question of the existence of tribal court jurisdiction in this case over Philip Morris."

The panel majority makes clear, however, that sales by defendants of King Mountain cigarettes on the Yakama Reservation are *not* at issue. It writes, "Philip Morris's complaint does not allege claims based on King Mountain's sales of its cigarettes on the Yakama Reservation, although there are passing references to such sales in later pleadings." Maj. op. at 741 n.3. Because the only sales at issue took place off the

Yakama Reservation, the question in this appeal is straightforward and quite narrow: Does the Yakama Tribal Court have colorable jurisdiction to decide whether off-reservation sales by tribal member defendants infringe the Marlboro trademark? The panel majority answers, correctly, that it does not.

The panel majority could have written a simple opinion relying on *Montana v. United States*, 450 U.S. 544 (1981). There the Supreme Court wrote that

> Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.

450 U.S. at 564 (internal citation omitted). The Court then noted two exceptions to the limitation on tribal power and tribal court jurisdiction. First, even on reservation land owned in fee simple by non-Indians a "tribe may regulate . . . the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* at 565 (citations omitted). Second, tribal jurisdiction extends to "conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566 (citations omitted).

Under *Montana*, the tribal court clearly lacks jurisdiction over this suit, which arose out of off-reservation conduct by tribal members that allegedly violated non-tribal law and injured a non-tribal member. The first *Montana* exception does not apply because the allegedly infringing conduct took

place off the reservation, and because Philip Morris is not in a consensual relationship with the defendants. The second exception does not apply because the conduct took place off the reservation, and because Philip Morris's legal claims do not threaten the "political integrity, the economic security, or the health or welfare of the tribe."

Rather than deciding this case based simply on *Montana*, the panel majority engages in extended dicta in an attempt to undermine the longstanding presumption of *Williams v. Lee*, 358 U.S. 217 (1959). In *Williams*, a non-member store owner brought suit against Navajo tribal members for goods bought on credit at a store located on the Navajo Reservation. The Court upheld tribal court jurisdiction. *Williams* has long stood for the proposition that a tribal court has jurisdiction over a civil suit arising out of on-reservation conduct brought by a non-member plaintiff against a member defendant. *See, e.g.,* Cohen's Handbook of Federal Indian Law 608 (2005) (discussing *Williams* and stating that "[s]tate courts lack jurisdiction to hear actions against Indians arising within Indian country").

In its dicta, the panel majority seeks to undercut the *Williams* presumption concerning party alignment — that a tribal court has jurisdiction over suits between members and non-members arising out of on-reservation conduct when the non-member is a plaintiff and the member is a defendant, though not when the member is a plaintiff and the nonmember is a defendant. For example, the panel majority writes, "While it is true that the Supreme Court has never applied *Montana* to a case involving a tribal defendant, *Montana* itself, as well as subsequent Supreme Court and Ninth Circuit precedents, supports our conclusion that the *Montana* framework is the starting point for suits involving nonmembers generally, *whether as plaintiffs or defendants*." Maj. op. at 732 (emphasis added). It writes further, "[I]n cases involving nonmembers, the inquiry focuses on whether a nonmember is being haled into tribal court against his will, not whether the party is the plain-

tiff or defendant." *Id.* at 732. And it writes, "Although the Supreme Court has never had occasion to consider the *Montana* exceptions vis-à-vis a tribal defendant, that fact seems more indicative of the unusual procedural posture of this case than the scope of *Montana*'s rule." *Id.* at 733. Finally, it writes, "Tellingly, the only case the Supreme Court has encountered with a similar procedural posture to this one was *Williams*, the very case it cited as exemplifying *Montana*'s exceptions." *Id.* at 733.

In minimizing the importance of party alignment, the panel majority ignores our recent en banc analysis in S*mith v. Salish Kootenai College,* 434 F.3d 1127 (9th Cir. 2006) (en banc). The three-judge panel in *Smith* had held that the tribal court did not have jurisdiction over a civil suit arising out of a roll-over accident on the reservation in which the plaintiff was a nonmember and the defendant was a member. The panel had concluded that the *Montana* framework applies "whenever there is a non-member party." *Smith v. Salish Kootenai College*, 378 F.3d 1048, 1052 (9th Cir. 2004). The panel wrote that the "Supreme Court has not distinguished between non-member plaintiffs and non-member defendants." *Id.* at n.5. Based on this analysis, the three-judge panel concluded that the tribal court did not have jurisdiction.

Our en banc panel reversed. The en banc majority explicitly disagreed with the three-judge panel's conclusion that the alignment of parties is irrelevant to the jurisdictional analysis:

> The Court's recent cases, and our own experience with the *Montana* exceptions, demonstrate that there are two facts courts look to when considering a tribal court's civil jurisdiction over a case in which a non-member is a party. *First, and most important, is the party status of the nonmember; that is, whether the nonmember party is a plaintiff or a defendant. . . .* The Court has repeatedly demonstrated its concern that tribal courts not require "defendants who are not

tribal members" to "defend [themselves against ordinary claims] in an unfamiliar court." Second, the Court has placed some store in whether or not the events giving rise to the cause of action occurred within the reservation. Within the reservation, "[t]o be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians . . . even on non-Indian fee lands . . . . "

The interaction of these factors — the status of the parties and the connection between the cause of action and Indian lands — is complex. Nevertheless, the cases provide some guidance for our discussion, and we can summarize them as follows. First, where the nonmembers are the *plaintiffs*, and the claims arise out of commercial activities within the reservation, the tribal courts may exercise civil jurisdiction. Second, where the nonmembers are *defendants*, the Court has thus far held that the tribes lack jurisdiction, irrespective of whether the claims arose on Indian lands.

434 F.3d at 1131-32 (first emphasis added; later emphases in original; brackets in original; citations omitted).

Judge Gould, who had written the panel opinion in *Smith*, dissented from the en banc opinion. He wrote:

The plain language of *Montana* indicates that its framework applies to legal actions involving "nonmembers" without limitation . . . . Moreover, in illustrating the application of the *Montana* framework, the Court has used *Williams* to illustrate examples of the *Montana* framework, indicating that nonmember plaintiffs, as well as nonmember defendants, fall within that doctrine.

*Id.* at 1141-42 (Gould, J., dissenting). The other two members of the three-judge panel in *Smith* — who had joined Judge

Gould in concluding that party alignment is unimportant in determining tribal court jurisdiction — were Judges McKeown and Brunetti. Judges McKeown and Brunetti, who comprise the panel majority in the case now before us, were not members of the en banc panel in *Smith*.

As in the three-judge panel decision in *Smith*, the panel majority in this case minimizes the importance of party alignment. The panel majority justifies its conclusion that party alignment is unimportant in two ways. First, it relies on two string citations of *Williams* in *Montana*. Maj. op. at 732-33. But those citations in no way suggested that *Montana* was intended to undermine the *Williams* presumption in favor of jurisdiction when a tribal member is a defendant. Moreover, *Montana* was decided long before our en banc decision in *Smith*; indeed, the meaning of *Montana* and *Williams* was central to our analysis in that case. Thus, string citations of *Williams* in *Montana* can hardly be used to escape our emphasis in *Smith* on the importance of party alignment.

Second, the panel majority relies on the Supreme Court's recent decision in *Plains Commerce Bank v. Long Family Land and Cattle Co.*, 128 S. Ct. 2709 (2008). Maj. op. at 732. But in that case the Court held that a tribal court did not have jurisdiction over a suit brought by member plaintiffs *against a nonmember defendant*. Because a nonmember rather than a member was the defendant, the *Williams* presumption in favor of tribal court jurisdiction was not at issue. Moreover, the Court cited *Williams* with approval, giving no hint that it intended to cut back or otherwise limit the *Williams* presumption. 128 S. Ct. at 2721.

Much of the panel majority's discussion in this case is dicta, and much of that dicta is contrary to Supreme Court case law and to our en banc opinion in *Smith*. Therefore, while I concur in the judgment, I respectfully decline to join the panel majority's opinion.