IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

CLAUDIA MEDINA, duly appointed Personal Representative of the
Estates of Carlos Mario Pena Jaramillo; Soraida Delgado Sierra;
Juliana Pena Delgado; and Manuela Pena Delgado,
*Plaintiff/Appellant*,

*v.*

The Estate of JAVAS JAYSEAN CODY, The Estate of AARON CHEE;
MARTINA GRANDSON, an unmarried woman; SENTRY INSURANCE
COMPANY f/k/a Sentry Insurance a Mutual Company,
*Defendants/Appellees.*

No. 1 CA-CV 22-0709
FILED 10-5-2023

Appeal from the Superior Court in Coconino County
No. S0300CV202000641
No. S0300CV202100003
The Honorable Ted Stuart Reed, Judge

**AFFIRMED**

COUNSEL

Hagens Berman Sobol Shapiro LLP, Phoenix
By Robert B. Carey, Michella A. Kras
*Counsel for Plaintiff/Appellant*

Zwillinger Wulkan, PLC, Phoenix
By Colin Bradley
*Counsel for Defendant/Appellee Jefferson Cody*

Appel Law Office, P.L.L.C., Fountain Hills
By Marc Appel
*Counsel for Defendant/Appellee Martina Grandson*

Christian Dichter & Sluga, P.C., Phoenix
By Gena L. Sluga
*Counsel for Defendants/Appellees Sentry Insurance Company*

Lewis Roca Rothgerber Christie LLP, Phoenix
By Susan M. Freeman
*Counsel for Defendants/Appellees Sentry Insurance Company*

Navajo Nation Department of Justice, Window Rock
By Sage G. Metoxen
*Counsel for Amicus Curiae Navajo Nation*

---

## OPINION

Presiding Judge D. Steven Williams delivered the Court's opinion, in which Judge Samuel A. Thumma and Judge Paul J. McMurdie joined.

---

**W I L L I A M S**, Judge:

¶1  The issue before us is whether a plaintiff who is not an enrolled tribal member may bring a civil tort case in state court against an enrolled tribal member for conduct occurring within tribal reservation boundaries but on a stretch of land for which the State has been granted a highway right-of-way easement. We hold that a non-tribal plaintiff bringing such a case cannot hale a nonconsenting enrolled tribal member defendant into state court for actions arising out of conduct on the defendant's reservation, even when that conduct occurs on a state highway. Accordingly, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

¶2  Early one evening in January 2019, Javas Jaysean Cody drove his mother's (Martina "Grandson") vehicle across the center line of an undivided highway into oncoming traffic, colliding with the Pena Delgado family's car. Tragically, the head-on collision killed the occupants of both vehicles on impact—the four members of the Pena Delgado family (Carlos, Soraida, Juliana, and Manuela), and Cody and his passenger, Aaron Chee.

2

The collision occurred along a section of U.S. Highway 89 located on the Navajo Nation. Both Cody and Chee were enrolled members of the Navajo Tribe, as was Grandson; the Pena Delgado family was not.

¶3        As a surviving Pena Delgado family member, Claudia Medina was appointed the personal representative of the Pena Delgado estates. Medina filed two wrongful death cases (later consolidated), one (predicated on negligence) against Cody's estate and the other (predicated on negligence and negligent entrustment) against Grandson and Chee's estate (collectively "the Defendants").

¶4        About eighteen months into the litigation, Sentry Insurance Company ("Sentry"), which insured Grandson and Chee at the time of the collision (and covered Cody as an additional insured), successfully moved to intervene. Sentry then moved to dismiss the consolidated cases, arguing, among other things, that the court lacked subject matter jurisdiction because the tort action arose "out of on-reservation conduct by Navajo tribal members."

¶5        Without addressing Sentry's other asserted bases for dismissal, the superior court dismissed Medina's claims for lack of subject matter jurisdiction based on the undisputed facts: (1) the Defendants are "Navajo tribal members residing on the Navajo Reservation," (2) the Pena Delgado family were non-tribal members, and (3) the location of the accident was "on a state highway within the Navajo Reservation." Upon entry of final judgment, Medina timely appealed. We have jurisdiction over this appeal under Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 12-120.21(A)(1) and -2101(A)(1).

## DISCUSSION

¶6        Medina challenges the superior court's dismissal of her tort action for lack of subject matter jurisdiction. Contrary to the superior court's implicit finding, Medina contends that tribal courts do not have exclusive jurisdiction over civil tort actions arising out of conduct that occurs on state-maintained rights-of-way running through tribal land.

¶7        "Subject matter jurisdiction is the power of a court to hear and determine a controversy." *Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 594, ¶ 13 (App. 2009) (internal quotations omitted). We review *de novo* whether a superior court has subject matter jurisdiction over a civil action. *Buehler v. Retzer ex rel. Indus. Comm'n*, 227 Ariz. 520, 521, ¶ 4 (App. 2011).

3

¶8         "[Q]uestions of jurisdiction over Indians and Indian country remain a complex patchwork of federal, state, and tribal law, which is better explained by history than by logic." *Smith v. Salish Kootenai Coll.*, 434 F.3d 1127, 1130 (9th Cir. 2006) (internal quotations omitted). To resolve such questions, courts must "inspect [the] relevant statutes, treaties, and other materials," including existing caselaw. *Strate v. A-1 Contractors*, 520 U.S. 438, 449 (1997).

¶9         In 1868, after decades of conflict, the Navajo Tribe entered a treaty with the United States government. *Arizona v. Navajo Nation*, 143 S. Ct. 1804, 1809 (2023); *see also* Treaty Between the United States of America and the Navajo Tribe of Indians, June 1, 1868, 15 Stat. 667 (ratified Aug. 12, 1868) ("Treaty of 1868"). "In exchange for the Navajos' promise not to engage in further war, the United States established a large reservation for the Navajos in their original homeland," including a substantial section of northeastern Arizona. *Arizona*, 143 S. Ct. at 1809–10. Apart from providing for designated tribal land, the Treaty of 1868 established "the Navajo Tribe as a sovereign entity" possessing "the right of self-government" within its territorial boundaries. *Begay v. Roberts*, 167 Ariz. 375, 379 (App. 1990). Indeed, as recognized by the United States Supreme Court, both the federal government and the Navajo Tribe "[i]mplicit[ly] . . . underst[oo]d" that under the treaty, "the internal affairs of the Indians remained *exclusively* within the jurisdiction of whatever tribal government existed." *Williams v. Lee*, 358 U.S. 217, 221–22 (1959) (emphasis added). Consistent with this understanding, courts construed the Treaty of 1868 "to preclude state court jurisdiction over Navajos living on the reservation" in matters arising from on-reservation activity. *Begay*, 167 Ariz. at 379; *see also McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 168–69, 175 (1973) (construing the Treaty of 1868 as precluding the "extension of state law . . . to Indians on the Navajo Reservation" and holding that under the "Indian sovereignty doctrine," tribal nations "hav[e] territorial boundaries, within which their authority is exclusive . . . [and] state law . . . ha[s] no role to play within the reservation boundaries").

¶10         More than forty-five years ago, in *Enriquez v. Superior Court*, this court squarely addressed the precise issue raised in this appeal—whether state courts may exercise jurisdiction over a civil tort action brought by a non-tribal member against an enrolled tribal member for damages resulting from a motor vehicle accident that occurred on a state highway within the limits of the tribal reservation on which the enrolled member resided. 115 Ariz. 342, 342–43 (App. 1977). To resolve that question, this court looked to: (1) the United States Supreme Court's opinion in *Williams*, 358 U.S. at 220, 222–23, holding that absent federal

legislation, state courts may not exercise jurisdiction over on-reservation activity because doing so would undermine the authority of tribal courts and infringe on the right of tribal members to make their laws and govern themselves; and (2) a federal criminal statute, 18 U.S.C. § 1151(a), which defines "Indian country" to include "all land within the limits of any Indian reservation . . . including rights-of-way running through the reservation." *Enriquez*, 115 Ariz. at 343. While acknowledging that 18 U.S.C. § 1151, on its face, "is concerned only with criminal jurisdiction," this court construed its definition of "Indian country" as applying "as well to questions of civil jurisdiction," concluding that the tribe's "granting of an easement" to the state for the highway "did not alter the status of the highway as being 'Indian country.'" *Id.* Having determined that the accident occurred on tribal land, this court reasoned that under *Williams*' infringement test, the state court lacked subject matter jurisdiction over the tort action brought against a tribal member: "[Tribes'] right of self-government includes the right to decide what conduct on the reservation will subject the Indians living there to civil liability in the Tribal court." *Id.*

¶11        In her briefing, Medina concedes that no Arizona case has overruled *Enriquez*, but she argues that subsequent case law calls into question its continuing viability. Specifically, she contends that since *Enriquez*, the jurisdictional analysis has evolved considerably under federal precedent—most notably, a series of United States Supreme Court cases—to apply much stricter limitations on the reach of tribal jurisdiction. Accordingly, Medina urges us to "revisit and reverse" *Enriquez* applying the current jurisdictional framework.

¶12        In addressing Medina's argument, we briefly return to *Williams*. In that case, the United States Supreme Court held that *Arizona courts lacked jurisdiction* over a civil collection action *brought by a non-tribal member*—who operated a general store on the Navajo reservation—*against two enrolled tribal members*—who purchased goods from the store on credit. 358 U.S. at 217–18, 223. Recounting the lengthy and complex history of relations between tribes and the federal government, the Supreme Court distilled the relevant inquiry to whether "state action" would "infringe[] on the right of reservation Indians to make their own laws and be ruled by them." *Id.* at 218–21. Absent federal legislation expressly limiting the authority granted to the Navajos in the Treaty of 1868, the Supreme Court held that Arizona state courts *may not exercise authority over enrolled tribal members for on-reservation conduct*, even when such conduct involves non-tribal members, because doing so would undermine tribal authority. *Id.* at 223.

¶13     Without overruling *Williams*, the United States Supreme Court, in subsequent cases, outlined a separate analytic framework for resolving conflicts between state and tribal jurisdiction. While the *Williams'* infringement test considers *the scope of state court jurisdiction* over an *enrolled tribal member*, these more recent cases approach jurisdictional conflicts differently, exploring *the extent of tribal court jurisdiction* over *non-tribal members*. *C'Hair v. Dist. Court of Ninth Judicial Dist.*, 357 P.3d 723, 728, ¶ 17 (Wyo. 2015) (contrasting the infringement test pronounced in *Williams*, "which looks to whether a state's exercise of jurisdiction over a matter will infringe on tribal self government," with the analytic approach adopted in *Montana v. United States*, 450 U.S. 544, 547–48 (1981), "which looks to whether tribal sovereignty requires tribal jurisdiction over a non-Indian or non-Indian activities").

¶14     In *Montana*, the United States Supreme Court considered *a tribe's authority* to prohibit hunting and fishing *by non-tribal members* on land *within* the tribe's territorial boundaries *but held* by non-tribal members in fee simple under an allotment act that permitted enrolled tribal members to "alienate [their] land to a non-Indian after holding it for 25 years." Holding that a tribe has no power to regulate non-tribal members' activities on land owned in fee by non-tribal members, the Supreme Court reasoned: "If Congress had wished to extend tribal jurisdiction to lands owned by non-Indians, it could easily have done so by incorporating" 18 U.S.C. § 1151's definition of "Indian country" into 18 U.S.C. § 1165, the statute governing hunting and fishing on tribal land. 450 U.S. at 562. Considering the scope of the "inherent powers retained by tribes and those divested," the Supreme Court determined that tribes lack the authority to "independently [] determine their external relations" but may exercise "civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands" within their territorial boundaries, when: (1) non-tribal members enter consensual relationships with the tribe or its enrolled members, or (2) "the conduct of non-Indians on fee lands within [the] reservation . . . threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 564–66 (concluding the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes").

¶15     While *Montana* primarily focused on the *regulatory* authority of tribes over conduct arising on land held in fee simple by non-tribal members within tribal territorial boundaries, the circumstances at issue in *Strate*, 520 U.S. at 453, involved *adjudicatory* jurisdiction. In *Strate*, a non-tribal member (the plaintiff) driving her car along a highway on tribal

land (but maintained by the State under a right-of-way) collided with a commercial vehicle owned and driven by non-tribal members. *Id.* at 442–43. The plaintiff sued the driver and the commercial vehicle owner *in tribal court* in tort for injuries sustained. *Id.* at 443–44. Pointing to *Montana* as "the pathmarking case concerning tribal civil authority over nonmembers," the Supreme Court reiterated that "tribes lack civil authority over the conduct of nonmembers on *non-Indian land* within a reservation, subject to two exceptions": (1) non-tribal members who enter consensual relationships with the tribe or its enrolled members, and (2) activity that directly affects the tribe's political integrity, economic security, health, or welfare. *Id.* at 445–47 (emphasis added).

¶16        Rejecting the plaintiff's contention that the *Montana* analysis did not apply because the accident occurred on tribal land, the Supreme Court reasoned that a right-of-way for a state highway on tribal land is "equivalent, *for nonmember governance purposes*, to alienated, non-Indian land" because it "is open to the public." *Id.* at 454 (emphasis added). In other words, because tribes must consent to such rights-of-way and receive "the payment of just compensation," and state highways "[are] subject to the State's control," tort actions *against non-tribal members* for conduct arising on such highways falls within the *Montana* jurisdictional framework. *Id.* at 454–456 (quoting 25 U.S.C. §§ 324–25). Accordingly, a tribal court may exercise jurisdiction over an "*action against nonmembers*" arising on a state right-of-way only if "one of *Montana*'s two exceptions" applies. *Id.* at 456 (emphasis added).

¶17        Quickly dispensing with the first exception, *Strate* held that tortious conduct does not qualify as a consensual relationship. *Id.* at 456–57. Concerning the second exception, the Supreme Court acknowledged that "careless" driving "on a public highway running through a reservation endanger[s] all in the vicinity, and surely jeopardize[s] the safety of tribal members." *Id.* at 458. But despite this generalized danger, the Supreme Court concluded that tribes need "[n]either regulatory nor adjudicatory authority over [] state highway accident[s] . . . to preserve" their right "to make their own laws and be ruled by them," lest "the exception would severely shrink the rule." *Id.* at 457–59 (internal quotations omitted). Accordingly, the Supreme Court determined that the "*Montana* rule"—no tribal court jurisdiction over non-tribal members' conduct on "non-Indian fee land"—applied, not its exceptions. *Id.* at 459.

¶18        Harmonizing *Montana* and *Strate*, the United States Supreme Court in *Nevada v. Hicks* expressly "reject[ed] tribal authority to regulate

7

*nonmembers' activities* on land over which [a] tribe c[an] not assert a landowner's right to occupy and exclude." 533 U.S. 353, 359 (2001) (emphasis added) (internal quotation omitted). Further distilling the scope of tribal authority, the Supreme Court declared: "[T]he absence of tribal ownership has been virtually conclusive of the absence of tribal civil jurisdiction; with one minor [taxing authority] exception, we have never upheld under *Montana* the extension of tribal civil authority *over nonmembers* on *non-Indian land*." *Id.* at 360 (emphasis added). To exercise jurisdiction over non-tribal members, the Supreme Court explained, tribal authority "must be connected to th[e] right of the Indians to make their own laws and be governed by them." *Id.* at 361. Recognizing that precedent historically described tribes as "sovereign entities," the Supreme Court clarified that under the modern jurisdictional framework, "[s]tate sovereignty does not end at a reservation's border," meaning states "may regulate the activities *even of tribe members on tribal land*" when the state's interests "are implicated." *Id.* at 361–62 (emphasis added).

**¶19**     Having reviewed these governing United States Supreme Court decisions, we return to the facts of this case. Because Arizona has not assumed general civil jurisdiction over Indian tribes and their members as federal law would allow, Pub. L. 83-280, § 3, 67 Stat. 590, its authority to address disputes involving tribal members for on-reservation conduct is limited by the jurisdictional framework pronounced by the United States Supreme Court. *See R.J. Williams Co. v. Fort Belknap Housing Authority*, 719 F.2d 979, 983 n.3 (9th Cir. 1983); *see also* 28 U.S.C. §§ 1322, 1360.

**¶20**     The question is whether the *state court* may preside over a tort action against *enrolled tribal members* predicated on conduct that occurred within the tribe's territorial boundaries. To answer that question, we must examine the scope of state court jurisdiction, not determine the extent of tribal court jurisdiction. *Cf. Smith Plumbing Co., Inc. v. Aetna Cas. & Sur. Co.*, 149 Ariz. 545, 550 (App. 1984) (concluding that the existence of jurisdiction in tribal court does not preempt jurisdiction in state court). Therefore, this case falls squarely under *Williams'* framework, which holds that a state court may exercise jurisdiction over a dispute brought by a non-tribal member against an enrolled tribal member for conduct arising on tribal land *only if* that exercise of jurisdiction does not violate federal law or infringe on the right of enrolled tribal members "to make their own laws and be ruled by them." 358 U.S. at 220.

**¶21**     Under this infringement test, state courts lack subject matter jurisdiction if: (1) a non-tribal member brings a claim against an enrolled tribal member for conduct occurring on that member's reservation, or (2)

all parties are enrolled tribal members of the same tribe and the claim involves conduct occurring on that tribe's reservation. *Winer v. Penny Enter., Inc.*, 674 N.W.2d 9, 12–13 (N.D. 2004) (citing *Williams*, 358 U.S. at 223; *Fisher v. District Court*, 424 U.S. 382, 387–89 (1976)); *see also Smith Plumbing Co., Inc.*, 149 Ariz. 524, 529 (1986) (noting the United States Supreme Court "has repeatedly recognized that tribal courts have inherent power to adjudicate civil disputes affecting the interests of Indians and non-Indians which are based upon events occurring on the reservation") (citation omitted). Medina does not contest that a tribal court has exclusive subject matter jurisdiction in such cases. Instead, she argues that under *Montana* and its progeny, a state-maintained highway—located on a right-of-way granted to the state from a tribal nation—is not tribal land. Stated differently, according to Medina, U.S. Highway 89, for jurisdictional purposes, is non-Indian fee land.[1]

**¶22**        In evaluating a state court's subject matter jurisdiction over a case involving both enrolled tribal member and non-tribal member parties, "whether the nonmember party is a plaintiff or a defendant" is the "most important" factor. *Salish Kootenai Coll.*, 434 F.3d at 1131, 1135 ("The ownership status of the land . . . is only one factor to consider[.]"). In other words, "[i]t is the membership status of the unconsenting party, not the status of real property, that counts as the primary jurisdictional fact." *Hicks*, 533 U.S. at 382 (Souter, J., concurring); *see also Smith Plumbing Co., Inc.*, 149 Ariz. at 530 ("A reservation Indian could not reasonably expect to be haled into Arizona state court because of [actions] occurring wholly on the reservation."); *State v. Zaman*, 194 Ariz. 442, 442, ¶ 2 (1999) ("For on-reservation activities, the status of the defendant as an Indian or non-Indian is the *sine qua non* of federal Indian law."); *State v. Zaman*, 190 Ariz. 208, 210 (1997) (explaining that "following *Williams*, . . . application of

---

[1]        In her reply brief, Medina alternatively argues, for the first time, that the Defendants' alleged tortious conduct occurred on state land because Cody began drinking—and Chee entrusted him with Grandson's vehicle—long before reaching the section of U.S. Highway 89 traversing the Navajo Nation (as demonstrated by Cody's blood alcohol content of .336). She also asserts that Cody began speeding and driving erratically at least one mile before Grandson's vehicle crossed into the Navajo Nation's territorial boundaries. Because Medina failed to raise these arguments in her opening brief—instead framing the appeal as presenting "a purely legal question"—we do not address them. *In re Marriage of Pownall*, 197 Ariz. 577, 583, ¶ 25 n.5 (App. 2000) (holding arguments raised for the first time in a reply brief are waived).

the infringement test in the adjudicatory setting has protected *Indian defendants* from nonconsensual state court jurisdiction").

**¶23**     Without question, the United States Supreme Court concluded in *Strate* that the state-maintained highway on which the accident occurred was the equivalent of non-Indian fee land. 520 U.S. at 454. But in reaching that conclusion, the Supreme Court carefully limited its equivalence determination to actions against non-tribal members. *Id.*; *see also Salish Kootenai Coll.*, 434 F.3d at 1137 (explaining that the United States Supreme Court framed the issue in *Strate* "as concerning the adjudicatory authority of tribal courts over personal injury actions *against defendants* who are not tribal members," ultimately holding that "tribal courts may not entertain claims *against nonmembers* arising out of accidents on state highways") (quoting *Strate*, 520 U.S. at 442). Thus, under *Strate*, the classification of a right-of-way located within a tribe's territorial boundaries, for jurisdictional purposes, depends upon the enrolled member or non-tribal member status of the defendant.

**¶24**     As Medina correctly notes, the United States Supreme Court, since *Montana*, has curtailed the scope of tribal authority, and may yet hold that state rights-of-way within tribal territorial boundaries are the equivalent of non-Indian fee land for jurisdictional purposes in all cases, regardless of the nonconsenting party's status. *See Winer*, 674 N.W.2d at 15, ¶ 15 (stating "[i]t is not yet clear whether *Strate* forecasts" a complete "erosion" of the *Williams*' analysis for "state rights-of-way") (quoting W. Canby, Jr., *American Indian Law in a Nutshell*, 175–76 (3rd ed. 1998)). But to date, the Supreme Court has not done so, nor do we.

**¶25**     Given its precise limiting language, we conclude that *Strate* does not supplant *Williams*. Applying the infringement test, we hold that the broad authority granted to the Navajo tribe to govern its enrolled tribal members under the Treaty of 1868 precludes the state court from exercising jurisdiction over this tort action. As federal precedent makes clear, a plaintiff bringing a claim against an enrolled tribal member cannot hale that nonconsenting defendant into state court for torts arising from conduct on the defendant's reservation, even on a state highway open under an easement. In this case, had the superior court resolved Medina's claims on the merits, it would have undermined the Navajo tribal court's authority and infringed on the Navajos' ability "to make their own laws and be ruled by them." *Williams*, 358 U.S. at 220; *Salish Kootenai Coll.*, 434 F.3d at 1140–41 (explaining a tribe's "system of tort is an important means by which [it] regulate[s] the domestic and commercial relations of its members"); *see also Holly C. v. Tohono O'Odham Nation*, 247 Ariz. 495, 515, ¶ 59 (App. 2019)

("Arizona courts properly refuse to accept jurisdiction over a case when doing so 'would undermine the authority of the tribal courts.'") (quoting *Williams*, 358 U.S. at 223). Therefore, the superior court properly dismissed the consolidated complaints for lack of subject matter jurisdiction.[2]

## CONCLUSION

¶26        For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:     AA

---

[2]        In reaching our conclusion, we recognize that at least one state court, in grappling with a jurisdictional conflict in a tort action brought by a non-tribal member against enrolled tribal members, determined that under "the principles announced in *Strate*," a state highway "is the equivalent of non-Indian fee land" for jurisdictional purposes. *C'Hair*, 357 P.3d at 725, 738, ¶¶ 1, 49–50. This reasoning is not binding and, in our view, stops short of giving full effect to the precise language used by the United States Supreme Court in *Strate* limiting the application of its equivalence determination to cases brought against non-tribal members.